STATE OF NEBRASKA EX REL. COUNSEL FOR DISCIPLINE OF
THE NEBRASKA SUPREME COURT, RELATOR, V.
JOHN L. APKER, RESPONDENT.
642 N.W.2d 162

Filed April 19, 2002.   No. S-01-538.

John W. Steele, Assistant Counsel for Discipline, for relator.

John R. Douglas, of Cassem, Tierney, Adams, Gotch & Douglas, for respondent.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

742

PER CURIAM.

## NATURE OF CASE

On May 9, 2001, the office of the Counsel for Discipline of the Nebraska Supreme Court filed formal charges against John L. Apker, the respondent. Apker filed an answer in which he substantially admitted the facts alleged in the formal charges. A referee was appointed to consider the charges and take evidence in the matter. In a report filed October 11, 2001, the referee concluded that Apker's conduct breached disciplinary rules and recommended a sanction of a 1-year suspension from the practice of law, retroactive to October 13, 2000, when Apker had voluntarily ceased the practice of law. Both Apker and the Counsel for Discipline take exception to the recommended sanction. The only issue presented in this proceeding is the appropriate sanction for Apker's unethical conduct.

## BACKGROUND

■ Neither Apker nor the Counsel for Discipline has taken exception to the referee's findings of fact. When no exceptions to the referee's findings of fact are filed by either party in a disciplinary proceeding, the Nebraska Supreme Court may, at its discretion, adopt the findings of the referee as final and conclusive. *State ex rel. NSBA v. Frederiksen*, 262 Neb. 562, 635 N.W.2d 427 (2001). The referee's report sets forth his findings of fact substantially as follows:

Apker was admitted to the practice of law in the State of Nebraska on April 23, 1987. He has been engaged in the practice of law in Omaha, Douglas County, Nebraska, since that date and at all times relevant to these proceedings.

Apker and the firm of Dwyer, Smith, Gardner, Lazer, Pohren and Forrest were asked to represent Virginia J. Gonzalez, guardian and conservator of F.G. Schlosser (Schlosser) in an action against Virginia M. Zalovich. Schlosser has five adult children: John Schlosser, Kenneth Schlosser, Barbara Lambries, Gonzalez, and Wanda L. Zielinski (collectively the Schlossers). Zalovich also has children who were not identified.

Schlosser is a widower. Zalovich is divorced. Schlosser and Zalovich decided to live together. They built a house together in 1990 which they owned jointly (the House). Schlosser and

Zalovich never married. They jointly prepared a revocable trust agreement (the Trust Agreement) which provided for the distribution of their interests in the House upon their death or moving from the House. The Trust Agreement provided that in that event the House would be sold, the proceeds would be distributed one-half to the Schlossers and one-half to the Zalovich children. The language was ambiguous regarding the requirement for sale if only one party died or moved from the House.

While Schlosser and Zalovich were cohabitating in the House, Schlosser became obsessed with having to pay real estate taxes on the House. To avoid paying these taxes, in September 1998, Schlosser transferred his interest in the House to Zalovich by a quitclaim deed, so that Zalovich now owns the House outright. The Trust Agreement was rewritten with generally the same terms and signed by Zalovich alone.

At some point, Schlosser developed signs of dementia and the inability to manage his own personal and financial affairs. The Schlossers requested and received court appointment of Gonzalez as Schlosser's guardian and conservator. Although Gonzalez is guardian and conservator, she consults with the other Schlossers on matters of importance to their father, Schlosser, and relies on individual siblings in their areas of expertise. She relies upon Kenneth Schlosser on legal matters, John Schlosser for investment matters, and the others on medical matters. Apker communicated with Gonzalez and the Schlossers primarily through Kenneth Schlosser.

After appointment of Gonzalez as guardian, Schlosser moved out of the House and into a hospital for care. In June 1999, Schlosser moved to a nursing home and has not returned to live in the House. The Schlossers then asked Zalovich to sell the House and distribute the Schlossers' share of the proceeds under the terms of the Trust Agreement. Zalovich refused on the basis that the Trust Agreement did not require her to move out of and sell the House, but that if it did, she would revoke it.

Apker was asked by the Schlossers to file an action to enforce the terms of the Trust Agreement as they interpreted it. The action was filed in the district court for Sarpy County in the name of Gonzalez, as guardian and conservator of the Estate of F.G. Schlosser, against Zalovich to enforce the terms of the

revokable trust requiring the sale of the House and distribution of one-half of the proceeds to the Schlossers. After depositions were taken, Zalovich filed a motion for summary judgment. The motion was heard on June 7, 2000, in the district court.

The district judge indicated at the argument on Zalovich's motion that he was leaning against Apker's position. Kenneth Schlosser and Barbara Lambries attended the hearing. Apker met with Kenneth Schlosser and Barbara Lambries after the hearing. Apker advised them that he believed they would not succeed on this motion and that he did not recommend an appeal of an adverse ruling. There was no agreement at the time as to whether they would appeal an adverse ruling. Kenneth Schlosser and Barbara Lambries delayed any decision until after they received the judge's order, reviewed it, and consulted with other siblings.

The court issued its order on June 9, 2000, granting Zalovich's motion for summary judgment and dismissing Gonzalez' petition (the Order). The district judge set out his reasoning in a two-page letter to counsel dated on the same date (the Opinion).

Apker received and reviewed the Order and the Opinion on June 15, 2000, and set them aside. When he got back to the Order on July 23, Apker wrote a letter to the Schlossers (the Gonzalez letter) advising them of the decision and enclosing copies of the Order and the Opinion. Before making copies of the Order and the Opinion, Apker removed the filing stamp from the Order and the date from the Opinion. The time for appeal of the Order had expired when Apker wrote the letter.

In the Gonzalez letter, Apker recapitulated the court's Order and Opinion. He went on to state:

> Although I do not agree with the Judge's interpretation of the trust, I do not feel that this decision should be appealed for several reasons. First, it is doubtful that the Court of Appeals or Supreme Court will reverse [the district court] on an interpretation question. . . .
>
> Second, the cost (both financial and emotional) in this case is significant. Any further litigation only will further deplete your father's resources. Given the slim chance of prevailing, I cannot recommend that an appeal be commenced.

The Gonzalez letter did not state that the time to appeal had already expired. Although Apker prepared the Gonzalez letter, he signed it "John L. Apker/LJM."

Upon receiving the Gonzalez letter, the Schlossers consulted another attorney, Pamela A. Car. Car noted that the Order was missing the customary filing stamp and date and that the Opinion was missing a date. Car wrote a letter to the district judge on August 14, 2000, inquiring about the authenticity of the copies of the court's undated Order and Opinion received by the Schlossers before she made "any appropriate referral to the disciplinary committee." A copy of this letter was also sent to Apker.

Apker responded to Car's letter to the district judge in a letter to Car dated August 18, 2000 (the Car letter), in which he made the following statements:

> Prior to receiving your letter, I did not realize that there was a problem in the delivery of the Order from [the district court] to our clients. . . .
>
> According to my time sheets, I received the Order from [the district court] on June 20, 2000 and dictated a letter to Mr. Ken Schlosser and Virginia Gonzalez on that same day. I revise[d] the letter on . . . June 23, 2000 (again according to my time records) and believed the letter had been sent. Obviously, it was not.
>
> My copy of the Order from [the district court] is the same as the Court file in that it reflects the date and the stamp. At no point in time was it my intention to delay the Order from getting to Mr. Schlosser and Ms. Gonzalez. My letter, in fact, directly mentions the appeal. It would seem incongruous to dictate a letter discussing an appeal if, in fact as you allege, my intent was to prohibit Schlosser and Gonzalez from appealing the Court's Order.
>
> I must admit I was quite dumbfounded by the content of your letter. In reviewing our file and my time charges, I was unable to ascertain why the letter had been delayed. However, upon further investigation, I learned the truth of the matter.
>
> In conversations with my secretary, she admitted that she had inadvertently misplaced the letter and had only discovered it in late July. Without intending to harm the

clients, she admitted to changing the date of the letter and in removing the date stamp and date line to the Order.

She also admitted to changing my time records to read "July" as opposed to "June" in an attempt to atone for her error.

I have asked her to prepare an affidavit stating these facts and will provide that document to you and your clients next week.

To further bolster the facts, if you look at the letter, my secretary executed it on July 23, 2000. July 23, 2000 was a Sunday. We do not work on Sundays and even if we (the attorneys) do work, we do not have our staff come in. Not only that, but it would have been difficult for me to prepare a letter on this date since I was in Rockford, IL the week of July 23 through July 28, 2000.

I was also curious as to why I did not immediately get the Order out on June 12, 2000 (the date I believe it would have been delivered to my office). Unfortunately, I was in Des Moines that week and did not actually review the Order until June 20, 2000. Obviously, had the letter gone out on June 23, 2000, Schlosser and Gonzalez would have had ample time to decide whether or not to appeal.

Apker has never produced such an affidavit from his secretary.

Apker altered the time records on his client billing to show the date of his "[l]etter to clients regarding Order" was June 20, 2000, instead of July 20, when it was actually performed. He also changed the date for his revision of the letter to show June 23, when the letter was actually revised July 23.

In September, Apker realized that his conduct had been "inappropriate," and on September 20, 2000, he contacted his attorney to discuss reporting his conduct to the Counsel for Discipline. Apker met with his attorney on September 22. When Apker's attorney contacted the office of the Counsel for Discipline, Apker's attorney was advised that the Counsel for Discipline had already received a complaint from Car regarding Apker's conduct.

Apker replied to Car's complaint by letter dated October 5, 2000. In this letter he stated:

Regarding the second allegation, I did receive the letter and Order from [the district judge] and, unfortunately, but

not intentionally, did not send the correspondence to my client until July 23, 2000. . . .

. . . .

Concerning the charge of tampering with the documents by removing the date, I admit to removing the date from [the district judge's] Order and letter. However, my intention was not to mislead my clients but, rather, to save myself the embarrassment of admitting that I had inadvertently over-looked sending the Order and letter to my clients in a timely manner. Since my clients had already advised me not to appeal from the anticipated adverse ruling, my recommen-dations not to appeal were a repetition of our prior discus-sions in [the District] Court. My references to my secretary in my letter of August 18, 2000, to Ms. Car were the result of my attempt to avoid the embarrassment of admitting that I had failed to timely forward information to my clients.

. . . .

I am extremely disappointed and embarrassed by my behavior and will cooperate fully with your office to resolve this matter. Please contact either myself or Mr. Douglas if you require additional information.

On October 13, 2000, Apker began a leave of absence from his firm at his request. He has subsequently turned down a job offer as trust officer with a bank because this charge is pending. He has been a stay-at-home father since October 13, and he has not practiced law since that date.

The Counsel for Discipline charged Apker with two counts of misconduct: count I, relating to the Gonzalez letter and alter-ation of the Order and the Opinion, and count II, relating to the Car letter. Based on the above-stated factual findings, the ref-eree concluded that Apker's conduct on counts I and II consti-tuted violations of Canon 1, DR 1-102(A)(4), of the Code of Professional Responsibility (engaging in conduct involving dis-honesty, fraud, deceit, or misrepresentation), and Canon 6, DR 6-102(A), of the Code of Professional Responsibility (attempting to exonerate himself from or limit his liability to client for his personal malpractice).

In considering the appropriate sanction, the referee noted that Apker had deliberately and knowingly deceived and misled his

client. However, the referee also observed that Apker's conduct was limited to an incident with one client over a period of only 2 months and that there was no evidence that Apker's conduct was reflective of how Apker had treated other clients at other times. Apker has no record of prior discipline. The referee noted that Apker self-reported his violation, admitted the factual allegations of the complaint, and had been fully cooperative with the Counsel for Discipline.

The referee also stated that the "most persuasive mitigating factor" was that Apker voluntarily discontinued the practice of law, effective October 13, 2000. The referee concluded that Apker deserved leniency in light of the mitigating factors. The referee recommended a sanction of a 1-year suspension from the practice of law, to be retroactive to October 13, 2000.

## ASSIGNMENTS OF ERROR

Neither Apker nor the Counsel for Discipline takes exception to the factual findings of the referee or the conclusion that Apker violated DR 1-102(A)(4) and DR 6-102(A). However, both Apker and the Counsel for Discipline take exception to the recommended sanction. The Counsel for Discipline takes exception to the recommendation that Apker's suspension be made retroactive to October 13, 2000. Apker takes exception to the recommendation of a suspension and argues that a private reprimand would be the appropriate sanction.

## STANDARD OF REVIEW

A proceeding to discipline an attorney is a trial de novo on the record. *State ex rel. Counsel for Dis. v. Lopez Wilson*, 262 Neb. 653, 634 N.W.2d 467 (2001).

## ANALYSIS

Under existing case law, the Nebraska Supreme Court is limited in its review to examining only those items to which the parties have taken exception. *State ex rel. NSBA v. Denton*, 258 Neb. 600, 604 N.W.2d 832 (2000). Under Neb. Ct. R. of Discipline 10(L) (rev. 2001), the Nebraska Supreme Court may, in its discretion, consider the referee's findings as final and conclusive. *Id.* Accordingly, we find, on our de novo examination of

the record, clear and convincing evidence that Apker's conduct, set forth above, violated DR 1-102(A)(4) and DR 6-102(A).

Violation of a disciplinary rule concerning the practice of law is a ground for discipline. *Lopez Wilson, supra.* To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, the Nebraska Supreme Court considers the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance and reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the respondent generally, and (6) the respondent's present or future fitness to continue in the practice of law. *State ex rel. NSBA v. Gallner,* 263 Neb. 135, 638 N.W.2d 819 (2002).

The referee determined that leniency is appropriate because of the mitigating factors present in this case. The determination of an appropriate penalty to be imposed on an attorney requires consideration of any mitigating factors. *State ex rel. NSBA v. Abrahamson,* 262 Neb. 632, 634 N.W.2d 462 (2001).

As the referee noted, the record indicates that Apker's conduct in representing Gonzalez was an isolated incident and did not represent a pattern of unethical conduct. In an attorney disciplinary proceeding, an isolated incident not representing a pattern of conduct is considered as a factor in mitigation. *Id.* Furthermore, Apker has been cooperative with the Counsel for Discipline during the investigation, and an attorney's cooperation during the disciplinary proceedings is considered as a factor in mitigation. See *id.* Apker has also admitted his misconduct and acknowledged responsibility for his actions, which reflects positively upon his attitude and character and is to be considered in determining the appropriate discipline. See *State ex rel. NSBA v. Frederiksen,* 262 Neb. 562, 635 N.W.2d 427 (2001).

However, these mitigating factors cannot obscure the nature of Apker's indefensible conduct in this incident, isolated though it may have been. Apker not only neglected a matter entrusted to him, depriving a client of the right to appeal an adverse judgment, but engaged in deception, prevarication, and forgery in attempting to conceal his neglect; when that was discovered, Apker attempted to shift the blame for his actions to an innocent party. Given those circumstances, a private reprimand, as suggested by Apker, is not appropriate to the nature of the offense.

The referee also found, as a mitigating factor, that Apker had voluntarily ceased the practice of law as of October 13, 2000, and that Apker's suspension from the practice of law should be made retroactive to that date. In two recent cases, this court has imposed a period of suspension and made that suspension retroactive. See, *State ex rel. NSBA v. Jensen*, 260 Neb. 803, 619 N.W.2d 840 (2000); *State ex rel. NSBA v. Aupperle*, 256 Neb. 953, 594 N.W.2d 602 (1999). Those cases are distinguishable from this case, however, in that in *Jensen* and *Aupperle*, this court had temporarily suspended the respondents' licenses to practice law during the pendency of the disciplinary proceedings. In this case, no temporary suspension was requested or entered by this court.

In *Jensen, supra,* and *Aupperle, supra,* it was appropriate for this court to make the suspensions retroactive to the respective dates on which this court had first suspended the respondents' licenses to practice law. In this case, although Apker has voluntarily ceased to practice law, his license to practice law has not yet been suspended by this court. To make a suspension from the practice of law retroactive under these circumstances would be to allow the respondent to choose the time and circumstances of his own suspension and would not serve the purposes of attorney discipline. Nonetheless, for the purpose of determining the proper discipline of an attorney, the Nebraska Supreme Court considers the attorney's acts both underlying the events of the case and throughout the proceeding. *Abrahamson, supra.* While we do not find that a retroactive suspension is appropriate where a temporary suspension has not been ordered by this court, we nonetheless consider Apker's voluntary cessation of the practice of law as a mitigating factor in determining what sanction should be imposed.

Absent mitigating factors, the conduct set forth above would merit no less than 1 year's suspension from the practice of law. However, each attorney discipline case must be evaluated individually in light of its particular facts and circumstances. *Frederiksen, supra.* Given the mitigating factors present in this case, including Apker's voluntary cessation of the practice of law on October 13, 2000, we conclude that a suspension of 6 months, effective from the date of this opinion, is warranted.

## CONCLUSION

It is therefore the judgment of this court that John L. Apker be suspended from the practice of law for a period of 6 months, effective immediately, after which period Apker may apply for readmission to the bar. Apker is directed to pay costs in accordance with Neb. Rev. Stat. §§ 7-114 and 7-115 (Reissue 1997).

JUDGMENT OF SUSPENSION.