STATE OF NEBRASKA EX REL. COUNSEL FOR DISCIPLINE
OF THE NEBRASKA SUPREME COURT, RELATOR, V.
GARY G. THOMPSON, RESPONDENT.
652 N.W.2d 593

Filed November 1, 2002.   No. S-01-489.

Kent L. Frobish, Assistant Counsel for Discipline, for relator.

Carole McMahon-Boies, of Pepperl & McMahon-Boies Law Offices, for respondent.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

The Counsel for Discipline of the Nebraska Supreme Court filed formal charges against Gary G. Thompson, respondent, alleging various ethical violations. Later, amended formal charges were filed. In a stipulation filed with the referee, Thompson admitted the allegations in the amended formal charges; admitted he violated his oath of office, Neb. Rev. Stat. § 7-104 (Reissue 1997); and admitted he violated various provisions of the Code of Professional Responsibility. The referee recommended a sanction of a 120-day mandatory suspension, followed by at least 2 years' probation. The only issue presented in this proceeding is the appropriate sanction for Thompson's unethical conduct.

## FACTS

Thompson was admitted to the practice of law on June 23, 1967, and, since 1971, has been engaged in the practice of law in Beatrice, Gage County, Nebraska. In April 1997, Thompson formed a partnership with Paul W. Korslund.

The Korslund and Thompson partnership apparently flourished, and in May 1997, they hired another attorney as an associate. In October 1998, Korslund was appointed as a district court judge and left the partnership. Thompson then formed a new partnership with the associate, and they hired another attorney.

When Korslund left the partnership, his caseload was transferred to Thompson. Thompson attributes much of his problems to his increased caseload. But, as noted by the referee, a careful examination of the timeline indicates that Thompson's neglect and misrepresentations began before Korslund left the partnership. It does appear, however, that Thompson's unethical behavior became more severe following Korslund's departure, and the three counts of misconduct largely stem from this time period.

### COUNT I

In October 1997, Thompson agreed to represent William J. Decker on a claim against Decker's disability insurance carrier, The Equitable Life Assurance Society (Equitable). On April 14, 1998, Thompson filed a petition in Gage County District Court. Equitable then removed the case to federal court on June 3. Thompson admitted that he lacked federal civil court experience and that when the case was removed, he did nothing to refresh or educate himself on federal civil procedure.

On August 29, 1998, the magistrate entered a case progression order setting a deadline for the completion of mandatory disclosures. Thompson and Equitable's counsel then agreed to extend the deadline. On November 18, Equitable served its initial disclosures and also filed a request for production of documents.

Thompson failed to comply with the deadline for mandatory disclosures and did not respond to the request for production of documents. On March 23, 1999, Equitable moved the court to compel Decker to provide initial disclosures and to respond to Equitable's request for production of documents. Thompson did not reply, and on April 16, the magistrate granted Equitable's

motion, ordered Decker to provide initial disclosures and respond to discovery by May 10, extended the progression schedule, and approved sanctions.

Thompson, however, again failed to respond, and Equitable moved for dismissal on May 24, 1999. Although Thompson served initial disclosures on June 17, he did not respond to Equitable's request for production of documents. Because of Thompson's failure to comply with discovery requirements and the order of the court, Decker's case was dismissed on July 19 and another sanction was imposed. Thompson personally paid all sanctions.

Thompson actively misrepresented the status of the case to Decker. He never voluntarily told Decker about his failure to provide discovery, about the sanctions, or about the dismissal of the case. Instead, he continued to assure Decker that the case was progressing normally.

In April 2000, Decker became suspicious about the status of the case and contacted another attorney. That attorney quickly determined that the case had been dismissed. On April 11, Decker and his wife went to see Thompson, ostensibly to find out the status of the case. Thompson initially told the Deckers that things were fine. When the Deckers confronted Thompson with the information they had obtained, Thompson admitted that the case had been dismissed, but represented that he had refiled the case in October 1999. In fact, Thompson did not attempt to reinstate the case until April 11, 2000. The district court denied that motion on April 26. It should be noted, however, that after Thompson withdrew, Decker was allowed to refile.

The referee determined that on Thompson's representation of Decker, the Counsel for Discipline had established by clear and convincing evidence that Thompson had violated his oath of office and the following provisions of Canons 1, 6, and 7 of the Code of Professional Responsibility:

DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice. . . .

. . . .

DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

(1) Handle a legal matter which the lawyer knows or should know that he or she is not competent to handle, without associating with a lawyer who is competent to handle it.

(2) Handle a legal matter without preparation adequate in the circumstances.

(3) Neglect a legal matter entrusted to him or her.

. . . .

DR 7-101 Representing a Client Zealously.

(A) A lawyer shall not intentionally:

. . . .

(2) Fail to carry out a contract of employment entered into with a client for professional services . . . .

. . . .

DR 7-102 Representing a Client Within the Bounds of the Law.

(A) In his or her representation of a client, a lawyer shall not:

. . . .

(5) Knowingly make a false statement of law or fact.

## COUNT II

Thompson became the attorney in fact for Gary Dickey on October 24, 1997. There was conflicting evidence about the nature of the representation. Dickey was incarcerated in an out-of-state correctional institution, and according to Dickey, he retained Thompson to recover some personal property in the possession of Spencer Fentress. Thompson claimed that he told Dickey that the property or proceeds from the sale of property could not be recovered until after Dickey was released from confinement. Thompson admitted, however, that he told Dickey that he had commenced a civil action against Fentress for the recovery of Dickey's personal property, when, in fact, he had filed no such action. The referee also concluded that Thompson had been

neglectful in failing to answer several letters and telephone calls from Dickey.

Thompson continued to represent Dickey after Dickey filed his complaint with the Counsel for Discipline. After Dickey's release, Thompson successfully prosecuted a replevin action against Fentress.

The referee determined that the Counsel for Discipline had established by clear and convincing evidence that Thompson had violated his oath of office and the following provisions of Canons 1, 6, and 7 of the Code of Professional Responsibility:

DR 1-102 Misconduct:

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

. . . .

DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

. . . .

(3) Neglect a legal matter entrusted to him or her.

. . . .

DR 7-102 Representing a Client Within the Bounds of the Law.

(A) In his or her representation of a client, a lawyer shall not:

. . . .

(5) Knowingly make a false statement of law or fact.

## COUNT III

In 1996, Deward Cummings filed a pro se discrimination suit against his former employer, the U.S. Postal Service, in federal court. In March 1997, Thompson entered his appearance on behalf of Cummings. Thompson filed an amended complaint, but missed the deadline for making initial mandatory disclosures. He then moved the court for leave to file a brief in opposition to the defendant's motion to dismiss. The court granted leave, but Thompson failed to file a brief. Instead, Cummings, through another attorney, filed bankruptcy. Thompson testified

that he did some research on the brief, but, because Cummings anticipated bankruptcy would stay the proceedings, he did not file the brief.

In August 1998, Cummings' case was returned to the active trial docket. The magistrate set January 19, 1999, as the date for the pretrial conference. Thompson failed to inform Cummings of the date and did not appear at the conference. Thompson testified that although he received notice of the conference, he failed to note the date on his calendar. Thompson also failed to properly follow the federal rules of civil procedure for two motions to produce. Both motions were considered abandoned by the magistrate because of Thompson's errors and omissions.

Finally, Thompson failed to file a brief in opposition to the defendant's motion for summary judgment. Although the court entered summary judgment for the defendant, the referee concluded that the failure to file the brief did not prejudice Cummings. The referee reasoned that the court's ruling was based on lack of jurisdiction and that the order showed that no evidence or point of law would have changed the court's ruling.

The referee determined that the Counsel for Discipline had established by clear and convincing evidence that Thompson had violated his oath of office and the following provisions of Canons 1 and 6 of the Code of Professional Responsibility:

DR 1-102 Misconduct:

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

(1) Handle a legal matter which the lawyer knows or should know that he or she is not competent to handle, without associating with a lawyer who is competent to handle it.

. . . .

(3) Neglect a legal matter entrusted to him or her.

### THOMPSON'S DEPRESSION

For each count, Thompson affirmatively alleged depression as a mitigating factor. Thompson had long suspected that depression played a role in his life, and even engaged in self-treatment with

St. John's Wort, but he failed to associate his unethical behavior with depression. In November 2001, Thompson sought a psychiatric evaluation from Walter J. Duffy, M.D. Duffy referred Thompson to his partner, Robert G. Arias, Ph.D., a psychotherapist and neuropsychologist. Arias diagnosed Thompson as suffering from "major depressive disorder, recurrent, moderate." Arias testified that Thompson's symptoms included decreased motivation, increased procrastination, sleep disturbance, concentration problems, and a high level of guilt. Thompson testified that these symptoms became predominate when Korslund left the partnership and transferred his caseload to Thompson.

Arias testified that the primary emotion underlying Thompson's depression was a feeling of being ashamed of himself, which resulted in an inclination on Thompson's part to construct an external view of himself that belies how he actually feels. This leads to difficulty in setting limits. For Thompson, this was reflected in the large number of community projects in which he took part and in his willingness to accept all clients regardless of their ability to pay. According to Arias, the result is a cycle of " 'learned helplessness.' " In other words, people like Thompson take on more than they can do to combat feelings of inadequacy, but, because they can never complete all the tasks assumed, their sense of inadequacy gets worse.

Arias also testified that depression would not cloud a person's ability to distinguish right from wrong, but that a major depressive disorder can compromise a person's motivation to such an extent that the person cannot do what he or she knows should be done.

When asked about the possibility of Thompson's experiencing a reoccurrence of depression, Arias testified that the greater the number of past episodes, the more likely one will be to suffer an episode in the future. Arias also testified that treatment significantly diminished the prospects of relapse and that one goal of Thompson's treatment would be to improve his ability to recognize that something was wrong before things got out of hand.

At the time of the hearing, Thompson was receiving treatment for his depression from both Arias and Duffy, including medication and psychotherapy. Arias testified that Thompson

was making significant progress and that he was "fairly optimistic" about Thompson's prognosis.

## REFEREE'S RECOMMENDED SANCTION

The referee concluded that Thompson's conduct, particularly in his representation of Decker, would ordinarily result in a severe sanction. But the referee found the evidence of Thompson's depression and its effect on his professional behavior to be "very persuasive" and used it as a mitigating factor. The referee recommended that Thompson be suspended from the practice of law for at least 120 days and that upon reinstatement, he be subject to probation for not less than 2 years. As a condition for reinstatement, the referee recommended that Thompson be required to continue his therapy. For the terms of probation, the referee recommended (1) continuing treatment, to be monitored by the Counsel for Discipline or the Nebraska Lawyers Assistance Program; (2) limiting Thompson's practice to those matters where he was experienced and felt comfortable and not allowing Thompson to go outside those areas unless he associates with a lawyer experienced in the relevant area of law; and (3) requiring a calendar control system to be monitored by the Counsel for Discipline.

## ASSIGNMENTS OF ERROR

Neither Thompson nor the Counsel for Discipline takes exception to the factual findings of the referee. The Counsel for Discipline takes exception to (1) the length of the recommended period of suspension and (2) the terms of probation.

## STANDARD OF REVIEW

A proceeding to discipline an attorney is a trial de novo on the record. *State ex rel. Counsel for Dis. v. Apker*, 263 Neb. 741, 642 N.W.2d 162 (2002); *State ex rel. Counsel for Dis. v. Lopez Wilson*, 262 Neb. 653, 634 N.W.2d 467 (2001).

## ANALYSIS

Under existing case law, we are limited in our review to examining only those items to which the parties have taken exception. *State ex rel. Counsel for Dis. v. Apker, supra.* Under Neb. Ct. R. of Discipline 10(L) (rev. 2001), we may, in our discretion, consider the referee's findings as final and conclusive. Accordingly,

we find, on our de novo examination of the record, clear and convincing evidence that Thompson's conduct, set forth above, violated his oath of office and the following provisions of the Code of Professional Responsibility: Canon 1, DR 1-102(A)(1), (4), and (5); Canon 6, DR 6-101(A)(1) through (3); and Canon 7, DR 7-101(A)(2).

The facts we have set out above establish that Thompson committed serious ethical breaches that would ordinarily result in a severe sanction. Over a period of almost 3 years, Thompson engaged in a pattern of neglect which severely frustrated his clients' attempts to seek redress through the judicial process. Particularly distressing is Thompson's handling of the Decker case. Not only did his neglect result in the dismissal of the case and the imposition of sanctions, but he repeatedly misrepresented to Decker and his wife the status of the case.

> A lawyer's integrity and the client's right to rely upon the lawyer's word form the bedrock of an attorney-client relationship. A knowingly false statement made by a lawyer to a client not only constitutes a breach of trust but also taints the reputation of the bar as a whole and requires firm disciplinary action in order to protect the public, as well as deter others from engaging in such conduct.

*State ex rel. NSBA v. Aupperle*, 256 Neb. 953, 962, 594 N.W.2d 602, 608 (1999).

However, "[t]he determination of an appropriate penalty to be imposed on an attorney requires consideration of any mitigating factors." *State ex rel. Counsel for Dis. v. Apker*, 263 Neb. at 749, 642 N.W.2d at 169. In this case, Thompson asserts his depression as a mitigating factor. Depression is a serious mental illness, and lawyers are not immune to its debilitating effects. In fact, a growing body of literature suggests lawyers are especially susceptible to experiencing depression. Connie J.A. Beck et al., *Lawyer Distress: Alcohol-Related Problems and Other Psychological Concerns Among a Sample of Practicing Lawyers*, 10 J.L. & Health 1 (1995-96); Patrick J. Schiltz, *On Being a Happy, Healthy, and Ethical Member of an Unhappy, Unhealthy, and Unethical Profession*, 52 Vand. L. Rev. 871 (1999). In a recent disciplinary case that, much like this one, involved attorney neglect and misrepresentations, the Iowa Supreme Court described

the interaction of depression and attorney misconduct and how depression affects the disciplinary process:

> Clearly, misrepresentation is the most serious violation in this case. The concept of such conduct is repulsive to our system of justice and its very presence within our profession supports serious discipline, justified by the need to deter the offender and others, protect the public, and maintain the reputation of the profession. . . . Yet, against the backdrop of depression, misrepresentation can take on added meanings, as can neglect. This backdrop complicates the imposition of discipline and requires us to fully examine the impact of depression.
>
> The evidence in this case reveals that serious depression often results from chemical imbalances in the brain that cause those afflicted to be plagued by growing and overwhelming feelings of hopelessness and despair. It also reveals that depression can take hold of a person without his or her knowledge or understanding of the need for treatment. . . . With the state of mind brought on by depression, it is understandable how neglect, and even excuses for nonperformance, can become part of the disease. . . . Thus, unethical professional conduct can double as a symptom of depression. . . . Moreover, these symptoms too often appear before the disease is diagnosed and treatment is sought.

(Citations omitted.) *Sup. Ct. Bd. of Prof. Ethics v. Grotewold*, 642 N.W.2d 288, 294-95 (Iowa 2002).

We have recognized that "[t]he nature of depression and the psychiatrist-assisted potential for cure are mitigating factors" in determining an appropriate sanction. *State ex rel. NSBA v. Gleason*, 248 Neb. 1003, 1008, 540 N.W.2d 359, 363 (1995). To establish depression as a mitigating factor, the respondent must show (1) medical evidence that he or she is affected by depression, (2) that the depression was a direct and substantial contributing cause to the misconduct, and (3) that treatment of the depression will substantially reduce the risk of further misconduct. Accord ABA Standards for Imposing Lawyer Sanctions § 9.32(i) (Supp. 1992). These are factual questions.

Here, the referee concluded that "[t]he testimony and evidence established that [Thompson] indeed suffered from a major

depressive episode during much of the period at issue, and that [Thompson's] depression symptoms played a major role in his conduct." The referee also determined that treatment would reduce the risk of further misconduct. The Counsel for Discipline did not take exceptions to the referee's factual findings, and under rule 10(L), we find the referee's conclusions concerning Thompson's depression to be final and conclusive. See *State ex rel. NSBA v. Frederiksen*, 262 Neb. 562, 635 N.W.2d 427 (2001). As a result, we must decide how Thompson's depression should impact his sanction.

To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, we consider the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance and reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the respondent generally, and (6) the respondent's present or future fitness to continue in the practice of law. *State ex rel. Counsel for Dis. v. Spindler, ante* p. 501, 648 N.W.2d 319 (2002); *State ex rel. Counsel for Dis. v. Apker*, 263 Neb. 741, 642 N.W.2d 162 (2002). Each case must be evaluated individually in light of its particular facts and circumstances. *State ex rel. NSBA v. Jensen*, 260 Neb. 803, 619 N.W.2d 840 (2000). For the purposes of determining the proper discipline of an attorney, this court considers the attorney's acts both underlying the events of the case and throughout the proceeding. *State ex rel. Counsel for Dis. v. Spindler, supra*; *State ex rel. NSBA v. Frank*, 262 Neb. 299, 631 N.W.2d 485 (2001).

The nature of depression, however, clouds several of the factors we normally consider in determining the appropriate sanction. Using a sanction as a deterrent for others loses some of its value. See *Sup. Ct. Bd. of Prof. Ethics v. Grotewold, supra.* The evidence in this case was that a major depression inhibits a person's ability to make rational choices by compromising his or her motivation to such an extent that the person cannot do what he or she knows should be done. As a result, threatening those like Thompson who suffer from an untreated mental illness with a severe sanction will have a limited effect, at best.

Our consideration of the maintenance and reputation of the bar as a whole is also affected by the nature of depression. See

*State ex rel. NSBA v. Gleason*, 248 Neb. 1003, 1007, 540 N.W.2d 359, 362 (1995) ("maintenance of the reputation of the bar is important to the court. The question is how to maintain the reputation"). The bar is not served by imposing punitive sanctions against those suffering from treatable mental illness. Instead, "the reputation of the profession can be vindicated by the diagnosis and successful treatment of the disease." *Sup. Ct. Bd. of Prof. Ethics v. Grotewold*, 642 N.W.2d 288, 295 (Iowa 2002).

The attitude of the offender is also of less importance because depression can negatively affect the attorney's attitude without his or her knowledge. In this case, Thompson repeatedly failed to cooperate with the Counsel for Discipline. Normally, such conduct would be treated as an aggravating factor, see *State ex rel. NSBA v. Simmons*, 259 Neb. 120, 608 N.W.2d 174 (2000), but here, the parties agree that Thompson's failure to cooperate with the Counsel for Discipline was a manifestation of Thompson's depression. Although Thompson initially failed to cooperate with the Counsel for Discipline, once treatment began, he became cooperative and expressed regret for the harm he had caused.

■ Our main concern in determining what effect Thompson's depression should have on his sanction is the protection of the public. As we have repeatedly said, "the purpose of a disciplinary proceeding against an attorney is not so much to punish the attorney as it is to determine whether in the public interest an attorney should be permitted to practice." *State ex rel. NSBA v. Frederiksen*, 262 Neb. 562, 568, 635 N.W.2d 427, 432-33 (2001). Accord *State ex rel. NSBA v. Jensen*, 260 Neb. 803, 619 N.W.2d 840 (2000). For many lawyers suffering from depression, the proper treatment can return them to being productive members of the bar with little risk that they will engage in future misconduct. There is always the danger, however, that their treatment may be ineffective or that, even if effective, they will stray from it. Accordingly, it is necessary to construct a sanction which adequately protects the public by ensuring both that the treatment has been successful and that the lawyer will continue with the treatment.

In cases involving depression as a mitigating factor, a period of mandatory suspension coupled with terms of reinstatement will often be appropriate. The suspension is not designed as

punishment. Instead, it is meant as a time period in which the respondent can seek treatment without posing a danger to his or her clients. Once the respondent can demonstrate that treatment has resulted in a meaningful and sustained recovery, he or she should then be placed on a period of probation with treatment and practice monitoring components.

At the hearing there was evidence that the treatment of Thompson's depression was having a positive effect, but Thompson also candidly admitted that he was currently unable to engage in a full general practice of law. After reviewing the evidence, we agree with the referee that a suspension of 120 days adequately ensures there will be evidence of a meaningful and sustained recovery before Thompson is allowed to return to practice. At the end of that period, Thompson may apply for reinstatement subject to the terms of probation. Upon his application for reinstatement, Thompson will have the burden of proving that he is fit to practice law under the terms of his probation, including that treatment for his depression has resulted in a meaningful and sustained recovery. Such proof shall include a showing that he has continued therapy with a qualified psychiatrist and psychotherapist, unless such psychiatrist releases Thompson from treatment.

Following readmission, Thompson shall be subject to probation for a period of not less than 2 years. The Counsel for Discipline filed exceptions to the referee's recommended terms of probation. The referee recommended a treatment monitoring program and a practice monitoring program, both of which were to be monitored by the Counsel for Discipline. Apparently, the Counsel for Discipline complains that its office is not capable of acting as a monitor. Counsel for Discipline suggests that the Nebraska Lawyers Assistance Program (NLAP) be the monitor for the treatment monitoring program and that a practicing attorney be arranged as the monitor for the practice monitoring program.

As for the treatment component of Thompson's probation, he will be required to comply with treatment recommendations of his treating psychotherapist and psychiatrist as monitored by NLAP. If at any time NLAP believes that Thompson has failed to comply with his treatment requirements, it shall report the same to the Counsel for Discipline.

As for the practice monitoring component of Thompson's probation, the Counsel for Discipline shall serve as the monitor. However, a practicing attorney may be substituted as the monitor if Thompson and the Counsel for Discipline can agree upon a practicing attorney who is willing to serve as Thompson's monitor. If a practicing attorney does serve as the monitor, he or she shall not be compensated for his or her duties, but he or she shall be reimbursed by Thompson for actual expenses incurred. We note that the record shows that a local attorney volunteered to act in a supervisory capacity.

During the probationary period, Thompson will be limited to those matters where he has experience and is comfortable. The Counsel for Discipline and Thompson should agree on these areas. Thompson may not accept a case outside the agreed-upon areas without notifying his practice monitor and associating with a lawyer experienced in the relevant area of law.

As part of the practice monitoring program, Thompson will also be required to maintain a calendar control system in which Thompson shall, at least monthly, provide a list of all cases for which he is then responsible to his practice monitor. The names of Thompson's clients shall be kept confidential by way of a number assigned to each case. It will be the duty of Thompson to inform his clients that he is required to provide this list to his practice monitor.

The lists shall include the following:

1. Date attorney-client relationship began.

2. General type of case (i.e., divorce, adoption, probate, contract, real estate, civil litigation, criminal).

3. Date of last contact with client.

4. Type and date of work completed on file (i.e., pleading, correspondence, document preparation, discovery, court hearing).

5. Type and date of work that should be completed on the case.

6. Any applicable statute of limitations and its date.

The practice monitor shall have the right to contact Thompson with any questions the monitor may have regarding the list. If the monitor is not the Counsel for Discipline, then if at any time the monitor believes Thompson has violated a disciplinary rule or has failed to comply with the terms of this probation, he or she shall report the same to the Counsel for Discipline.

At the end of the 2-year probationary period, it will be Thompson's burden to show cause why the period of probation should not be extended for another year. If probation is extended, it will be Thompson's burden to show cause why the period of probation should not be extended for an additional year, until Thompson is released from probation.

## CONCLUSION

It is the judgment of this court that Thompson be suspended from the practice of law for a period of 120 days, effective immediately, after which time Thompson may apply for readmission consistent with the terms of reinstatement as outlined above. Following reinstatement, Thompson shall be subject to a term of probation for not less than 2 years with the terms as outlined above. Thompson shall comply with Neb. Ct. R. of Discipline 16 (rev. 2001), and upon failure to do so, Thompson shall be subject to punishment for contempt of this court. Accordingly, Thompson is directed to pay costs and expenses in accordance with Neb. Rev. Stat. §§ 7-114 and 7-115 (Reissue 1997) and Neb. Ct. R. of Discipline 23(B) (rev. 2001).

JUDGMENT OF SUSPENSION AND PROBATION.