IN RE APPLICATION OF DAVID V. HARTMANN FOR ADMISSION TO THE NEBRASKA STATE BAR ON EXAMINATION.
705 N.W.2d 443

Filed November 10, 2005.    No. S-34-040002.

Sean J. Brennan for applicant.

Brad Roth and Chris Blomenberg, of McHenry, Haszard, Hansen, Roth & Hupp, P.C., for Nebraska State Bar Commission.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

David V. Hartmann appeals from a decision of the Nebraska State Bar Commission (Commission), denying his application to take the July 2004 bar examination, based upon its determination that Hartmann does not meet the character and fitness requirements for admission. We sustain the Commission's recommendation that Hartmann not be allowed to sit for the Nebraska bar examination.

## BACKGROUND

Hartmann, whose date of birth is August 22, 1961, obtained his law degree in May 2002 and initially applied to take the July 2002 bar examination. In his application, Hartmann disclosed his complete criminal history, which included a 1977 charge of reckless driving, a 1992 charge of driving under the influence that was later reduced to reckless driving, a 2001 charge of improper passing that was subsequently dropped, and a 2002 charge of third degree sexual assault. The latter charge was based on allegations made by K.H.V., Hartmann's niece who was then 15 years old. The charge was pending in Seward County at the time of Hartmann's application. On or about May 13, 2002, the Commission received an anonymous letter from a "concerned citizen" informing it of the sexual assault charge. On June 25, the Commission notified Hartmann that it would permit him to sit for the July 2002 examination but was withholding approval of his application on character and fitness grounds until

further investigation could be completed. Hartmann did not pass the July 2002 examination, and thus the character and fitness issues became moot.

Hartmann then applied to sit for the February 2003 bar examination. In this application, he explained that the sexual assault charge had been dismissed in Seward County but had been refiled and was then pending in Lancaster County. This charge was eventually amended to third degree assault. Hartmann was convicted on his plea of no contest and paid a $1,000 fine as ordered. Hartmann also notified the Commission of a November 2002 charge of driving under the influence (DUI) and his conviction on a reduced charge of willful reckless driving which resulted in a fine and a term of probation that Hartmann had completed.

Hartmann was unable to sit for the February 2003 bar examination because his Army National Guard unit was mobilized into active federal service. He subsequently filed an application to take the July 2004 bar examination. This application completely and accurately informed the Commission of all his prior criminal history. By letter dated May 24, 2004, the Commission notified Hartmann that it was refusing him permission to take the examination "on the grounds that [he] lack[ed] the necessary character and fitness for admission." The Commission advised Hartmann of his appeal rights under Neb. Ct. R. for Adm. of Attys. 10 (rev. 2000). Hartmann requested a hearing before the Commission, which was held on October 5 and 26, 2004. Prior to the hearing, the Commission specified that it had denied Hartmann's application based on his 1992 and 2002 DUI charges, which were reduced to reckless driving and willful reckless driving, respectively; his conviction on the third degree assault charge; and allegations that he had committed offenses involving minors.

K.H.V. was married in June 2004 and resides in another state. She provided written statements to the Commission and testified at the hearing about the incident which led to Hartmann's charge of third degree sexual assault, later amended to third degree assault for "threaten[ing] another in a menacing manner." See Neb. Rev. Stat. § 28-310(1)(a) (Reissue 1995). According to K.H.V., Hartmann took her, her brother, and a female friend to a movie in Lincoln, Nebraska, on December 29, 2001. K.H.V. testified that Hartmann sat next to her in the movie theater and

placed a coat over the armrest between their seats. She testified that during the movie, Hartmann repeatedly touched her in a sexual manner with his hand beneath the coat. In his testimony, Hartmann testified that he attended the movie with K.H.V. and the others on January 5, 2002. He admitted that he placed his hand on K.H.V.'s leg early in the movie in an attempt to retrieve some candy that she was "hiding." He then stated: "And the truth is that I — I left my hand on her leg longer than I should have." When asked why he did so, he replied:

> In retrospect, it seems to me that in the — the warmth of that moment and given the closeness that [K.H.V.] and I felt as uncle and niece, it made me — and given the fact that I had been, in my opinion, having a dismal holiday season, it just made me feel comfortable and better.

When asked how long he left his hand on his niece's leg, he replied, "I don't know. It was longer than it should have been." Hartmann stated that he touched only the "middle outer part" of K.H.V.'s leg. He emphatically denied that he touched K.H.V. in a sexual manner or that his hand was under a coat when he touched her leg. Although he described the initial contact as "horsing around," he acknowledged that it was "a horrible mistake on my part to — to maintain that contact."

On March 14, 2002, Hartmann wrote a letter to K.H.V. and her parents in which he apologized for his actions at the movie theater without specifically describing those actions. Hartmann supplied a copy of this letter to the Commission along with other information concerning the movie theater incident. In the letter, Hartmann stated:

> I remember exactly when things went wrong in my relation with [K.H.V.] It was at our Thanksgiving family meal here at home in the year 2000, I felt [K.H.V.'s] legs against mine under the dinner table, and it was comforting somehow. As crazy as this might sound, I think that at first it was a kind of innocent flirtation going on, if you can use that phrase in this context—but, as we all now know, it went further than that, much further than it ever should have.

Hartmann testified that this letter was written after his brother and sister-in-law, the parents of K.H.V., told him that K.H.V. was upset about the incident at the movie theater. He testified that the

letter referred to his touching of his niece's leg during the movie, as recounted in his testimony, and that at the time he wrote the letter, he was not aware that K.H.V. had alleged any contact of a sexual nature. The criminal charge arising from this incident was initially filed in April 2002. Hartmann testified that he eventually entered a no contest plea to the reduced charge of third degree assault, in part to spare members of his family from appearing in court "to argue about something that should have been resolved at the family level." He now regrets his decision to enter into the plea agreement.

In her testimony at the hearing and in written statements submitted to the Commission, K.H.V. also accused Hartmann of unlawful conduct on numerous occasions before the movie theater incident and later on the same day that the incident occurred. She claimed that many of the incidents occurred during family gatherings. Hartmann denied these accusations, except for one occasion on which he admitted touching his niece's knee while seated next to her at a table. Although he acknowledged a "level of flirtation" between himself and K.H.V. beginning in late 2000 or 2001, Hartmann denied that the relationship was romantic or sexual in nature. Hartmann's attorney brought out various inconsistencies in the account of events which K.H.V. gave to the Commission and previous accounts she had given to others, including law enforcement personnel. He also adduced evidence that a poem she claimed to have written and given to her grandmother was a copyrighted work published on the Internet. Numerous members of Hartmann's extended family testified and submitted written statements disputing K.H.V.'s allegations and questioning her veracity and that of her mother.

Hartmann testified that while in college in 1988, he had had a problem with a girl friend and began binge drinking. He quit drinking in 1996, but resumed in 2002 and continued until after his DUI arrest in November of that year. He admitted that his relapse in 2002 was because of stress he was experiencing because of dissention among members of his family after the sexual assault charges were filed. After his DUI arrest, however, Hartmann attended a substance abuse course and alcohol counseling, and at the time of the hearing, he characterized his alcohol use as "extremely infrequent."

In response to an allegation that he had been terminated from a teaching position, Hartmann testified concerning an incident which occurred when he was employed as a teacher at a parochial middle school in another state. After the conclusion of the school year, he wrote a letter to one of his female students in which he expressed his admiration for her and his hope that they could meet again when she was older. When he wrote the letter, Hartmann was 28 years old and the student was 14. Hartmann denied that he was pursuing a sexual relationship with the student. After being alerted to the letter by the parents of the student, the school principal contacted Hartmann and told him that the letter was inappropriate. School officials encouraged him to seek counseling before returning to the classroom. Hartmann decided to leave the teaching profession and return to Nebraska. He provided the Commission with a letter from the school principal confirming that Hartmann was employed as a teacher for the 1990-91 school year, that he fulfilled his teaching obligations for that year, and that his resignation was voluntary.

Two mental health professionals testified at the hearing. Mary Lutz-Priefert, a licensed mental health practitioner and certified professional counselor, began seeing K.H.V. in January 2004 and counseled with her approximately 30 times prior to the hearing. Lutz-Priefert diagnosed K.H.V. with posttraumatic stress disorder. She testified that K.H.V. was very consistent in her reports of Hartmann's conduct and that it was "[v]ery, very unlikely" that her reports were fabricated. During cross-examination, however, Lutz-Priefert admitted that she had not reported the allegations to authorities and that she was not aware of what the police were told about what had happened at the movie theater. Although Lutz-Priefert testified that she always asked K.H.V. very open-ended questions, K.H.V. subsequently testified that Lutz-Priefert would sometimes ask her direct questions about whether specific conduct had occurred.

Dr. Robert D. Larson, a clinical psychologist, also testified at the hearing. Larson began seeing Hartmann after the Commission denied Hartmann permission to take the July 2004 bar examination and had met with him eight times prior to the hearing. He believed that Hartmann was always truthful with him. According to Larson, Hartmann admitted that he placed his hand on K.H.V.'s

leg during the movie and kept it there for an inappropriate amount of time, approximately 1 hour. Hartmann also admitted to Larson that he had touched K.H.V.'s leg or knee with his hand at a Thanksgiving meal. Larson described Hartmann's touching as a means of deriving emotional gratification and a feeling of comfort and stated that the acts were not done for sexual gratification.

Based upon what he deemed to be a reliable psychological evaluation performed by another psychologist, Larson diagnosed Hartmann with "[m]ajor depressive disorder, adjustment disorder with depressed mood, and personality disorder not otherwise specified." Larson explained that the adjustment disorder is a reactive depression caused by situational circumstances and that the major depressive disorder is characterized by long-term bouts of depression. The personality disorder involves dependency issues. According to Larson, Hartmann forms a premature emotional attachment to women he dates and then feels a very strong sense of rejection when the relationship ends. To relieve the pain of these rejections, Hartmann has turned to abusing alcohol and to romantically idealizing young women, resulting in his "making choices and even actions that were just not wise, not appropriate."

Larson testified that Hartmann had made progress in identifying and taking responsibility for his "pattern" of behavior with young women and had become aware of how he views them in an inappropriate way. However, Larson also testified that because his counseling time with Hartmann had been limited, he was still in the assessment phase of treatment and had not had an opportunity "to get too much into the intervention phase," which he planned to address in further counseling. Larson also testified that he had noted, but had not addressed, Hartmann's issues related to alcohol use.

Larson stated that because Hartmann was aware of his problem and motivated to resolve it, it was his opinion that Hartmann would be able to provide legal services to clients without risk of harm. However, he acknowledged that Hartmann's representation of a young female client could elicit "different kinds of emotional responses" which would need to be addressed in counseling. Larson testified that he intended to continue meeting with Hartmann about once every 3 weeks. When asked by

a member of the Commission to give his assessment of how Hartmann would function under a high degree of stress, Larson replied: "I think that there are times where he may get somewhat overwhelmed by the level of stress that he's under. And so I guess . . . I see that, at this point, still a work in progress."

Hartmann agreed with Larson's assessment and admitted that in retrospect, he had made mistakes in forming emotional attachments to his former student and K.H.V. He testified that he has benefited from Larson's counseling and that he would continue seeing him "until I feel confident . . . that I can persevere no matter . . . what happens in my emotional life." Hartmann confirmed his statement to Larson that he was currently involved in a stable relationship with an adult female and submitted a letter from this person, which was supportive of his application.

In addition to the letters from family members identified above, Hartmann submitted letters from former employers, including a governmental agency and a private law firm where he worked as a law clerk. The letters were supportive of his character and fitness for admission to the bar. The record also includes a favorable military fitness report pertaining to Hartmann, completed in January 2004. One of Hartmann's law professors testified at the hearing in support of his application. There is no indication that any of these persons, other than members of Hartmann's family, had knowledge concerning the incident involving K.H.V. or Hartmann's psychological status as described by Larson.

On October 28, 2004, the Commission notified Hartmann that it was denying his request to take the bar examination "on the basis that he lacks the requisite fitness and character for admission to the Nebraska Bar." Hartmann filed this timely appeal pursuant to rule 10 and Neb. Ct. R. for Adm. of Attys. 15 (rev. 2000).

## ASSIGNMENT OF ERROR

Hartmann's sole assignment of error is that the Commission erred in finding he lacks the requisite character and fitness for admission to the Nebraska bar.

## STANDARD OF REVIEW

Under rule 15, the Nebraska Supreme Court considers the appeal of an applicant from a final adverse ruling of the Commission de novo on the record made at the hearing before

the Commission. *In re Application of Roseberry, ante* p. 508, 704 N.W.2d 229 (2005); *In re Application of Silva,* 266 Neb. 419, 665 N.W.2d 592 (2003).

## ANALYSIS

■ The Nebraska Supreme Court is vested with the sole power to admit persons to the practice of law in this state and to fix qualifications for admission to the Nebraska bar. *Id.* Nebraska statutory law further provides: "No person shall be admitted . . . unless it is shown to the satisfaction of the Supreme Court that such person is of good moral character." Neb. Rev. Stat. § 7-102(1) (Cum. Supp. 2004). We have delegated administrative responsibility for bar admissions solely to the Commission. *In re Application of Silva, supra.*

Neb. Ct. R. for Adm. of Attys. 3 (rev. 2005), which governs the admission of attorneys, describes the applicable standards for character and fitness of attorneys as follows:

> An attorney should be one whose record of conduct justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to them. A record manifesting a significant deficiency by an applicant in one or more of the following essential eligibility requirements for the practice of law may constitute a basis for denial of admission.

In addition to the admission requirements otherwise established by these rules, rule 3 recites the following essential eligibility requirements for admission to the practice of law in Nebraska:

> (a) The ability to conduct oneself with a high degree of honesty, integrity, and trustworthiness in all professional relationships and with respect to all legal obligations;
>
> (b) The ability to conduct oneself diligently and reliably in fulfilling all obligations to clients, attorneys, courts, and others;
>
> (c) The ability to conduct oneself with respect for and in accordance with the law and the Nebraska Rules of Professional Conduct;
>
> . . . .
>
> (f) The ability to exercise good judgment in conducting one's professional business;

(g) The ability to avoid acts that exhibit disregard for the health, safety, and welfare of others;

. . . .

(j) The ability to conduct oneself professionally and in a manner that engenders respect for the law and the profession.

Appendix A to our rules governing the admission of attorneys further clarifies the character and fitness standards and provides in part:

The primary purposes of character and fitness screening before admission to the bar of Nebraska are to assure the protection of the public and to safeguard the justice system. . . . The public is adequately protected only by a system that evaluates character and fitness as those elements relate to the practice of law. The public interest requires that the public be secure in its expectation that those who are admitted to the bar are worthy of the trust and confidence clients may reasonably place in their attorneys.

The applicant for admission bears the burden of proving good character by producing documentation, reports, and witnesses in support of the application. *In re Application of Roseberry, ante* p. 508, 704 N.W.2d 229 (2005); *In re Application of Silva*, 266 Neb. 419, 665 N.W.2d 592 (2003). " ' "A record manifesting a significant deficiency in the honesty, trustworthiness, diligence, or reliability of an applicant may constitute a basis for denial of admission." ' " *In re Application of Roseberry, ante* at 516, 704 N.W.2d at 234. Appendix A to our rules governing the admission of attorneys lists the following as relevant conduct that should be treated as cause for further inquiry before the Commission decides whether an applicant possesses the character and fitness to practice law:

1. misconduct in employment;

2. acts involving dishonesty, fraud, deceit, or misrepresentation;

3. abuse of legal process, including the filing of vexatious lawsuits;

4. neglect of financial responsibilities;

5. neglect of professional obligations;

6. violation of an order of a court, including child support orders;

7. evidence of mental or emotional instability;

8. evidence of drug or alcohol dependence or abuse;

9. denial of admission to the bar in another jurisdiction on character and fitness grounds;

10. disciplinary action by an attorney disciplinary agency or other professional disciplinary agency of any jurisdiction.

When there is evidence that an applicant has engaged in any such conduct, the Commission is required to "determine whether the present character and fitness of an applicant qualify the applicant for admission" based on the consideration of the following factors:

1. the applicant's age at the time of the conduct;

2. the recency of the conduct;

3. the reliability of the information concerning the conduct;

4. the seriousness of the conduct;

5. the factors underlying the conduct;

6. the cumulative effect of the conduct or information;

7. the evidence of rehabilitation;

8. the applicant's positive social contributions since the conduct;

9. the applicant's candor in the admissions process;

10. the materiality of any omissions or misrepresentations.

*Id.*

In this case, K.H.V. has made multiple allegations that the unlawful conduct on the part of Hartmann extended over a period of years. Hartmann has denied these allegations, with the exception of his account of the January 2002 movie theater incident which led to his plea of no contest to a reduced charge of third degree assault, a Class I misdemeanor. Insofar as we can determine from the record, only the allegation pertaining to the incident at the movie theater resulted in the filing of a criminal charge. There is thus sharply conflicting evidence as to the uncharged allegations of criminal conduct and those originally

charged allegations which were not resolved by Hartmann's no contest plea to the reduced charge. However, in view of the facts which are not in dispute by virtue of Hartmann's plea, as well as his testimony and other evidence submitted by him in this proceeding, we need not resolve this conflict.

The admitted facts are that Hartmann, then a 39-year-old, third-year law student, placed his hand on the leg of his 15-year-old niece in a darkened movie theater and left it there for an inappropriate period of time and that on the basis of this conduct, he pled no contest and was convicted of third degree assault, in that he "threaten[ed] another in a menacing manner." See § 28-310(1)(b). Hartmann also admitted that he had previously placed his hand on his niece's leg or knee while seated next to her at a family dinner. We consider these facts in the context of certain other undisputed information which includes the inappropriate personal letter which Hartmann, as a 28-year-old middle school teacher, wrote to his former student, then 14 years old, and Hartmann's 1992 and 2002 DUI arrests, which led to his pleading guilty to reduced charges of reckless and willful reckless driving. Tying these facts together is Larson's testimony that Hartmann suffers from psychological disorders which have produced a pattern of conduct marked by "making choices and even actions that were just not wise, not appropriate." Larson testified that Hartmann was making progress in understanding and dealing with these problems and expressed an opinion that he would not pose a risk to clients if permitted to practice law. However, when questioned by a commissioner about Hartmann's ability to function under stress, he replied: "I think there frankly still needs to be dealing with his stress management abilities. I think that there are times where he may get somewhat overwhelmed by the level of stress that he's under. And so I guess . . . I see that, at this point, still a work in progress."

Based upon our de novo review of these undisputed portions of the record, we conclude that there is a pattern of behavior which, because of its seriousness and recency, reflects adversely upon Hartmann's present character and fitness to engage in the practice of law. This conduct casts significant doubt upon Hartmann's ability to conduct himself with respect for, and in accordance with, the law; to exercise good judgment; and to

640

avoid acts that exhibit disregard for the health, safety, and welfare of others. We further conclude that there is insufficient evidence of rehabilitation to safely predict that the pattern of behavior will not recur. The practice of law is a profession which can be attended by significant stress, and a lawyer's inability to manage such stress can harm the interests of a client. See, e.g., *State ex rel. Counsel for Dis. v. Thompson,* 264 Neb. 831, 652 N.W.2d 593 (2002) (lawyer's failure to take necessary actions on behalf of clients related to untreated depression). Substance abuse is often a factor in attorney discipline cases. See, *State ex rel. Counsel for Dis. v. Hughes,* 268 Neb. 668, 686 N.W.2d 588 (2004); *State ex rel. Counsel for Dis. v. Wintroub,* 267 Neb. 872, 678 N.W.2d 103 (2004). At the time of the hearing, Hartmann was still undergoing treatment for the psychological condition to which he attributes his conduct, and Larson could not state with a reasonable degree of certainty that his problems were resolved. We conclude that the record does not afford a sufficient basis for predicting when, if, or how such resolution will occur. We are neither bound nor persuaded by Larson's opinion that Hartmann would pose no risk to clients if admitted to the practice of law. Accordingly, we affirm the recommendation of the Commission to deny Hartmann's application for admission.

APPLICATION DENIED.