STATE OF NEBRASKA EX REL. COUNSEL FOR DISCIPLINE
OF THE NEBRASKA SUPREME COURT, RELATOR, V.
SCOTT H. RASMUSSEN, RESPONDENT.
662 N.W.2d 556

Filed June 6, 2003.   No. S-02-503.

Kent L. Frobish, Assistant Counsel for Discipline, for relator.

Scott H. Rasmussen, pro se.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

The Counsel for Discipline of the Nebraska Supreme Court, the relator, filed formal charges against Scott H. Rasmussen alleging multiple ethical violations. This court appointed a referee, and a hearing was held on the charges. The referee determined that Rasmussen's conduct had breached several disciplinary rules. The referee recommended a suspension of not less than 2 years. Rasmussen filed exceptions to the report and recommendation of the referee.

## I. FACTS

Rasmussen was admitted to the practice of law on October 9, 1985. During the time period relevant to this proceeding, Rasmussen practiced law in Omaha.

The formal charges filed by the relator contained four counts, which are described separately below.

### 1. COUNT I

Count I arises out of Rasmussen's representation of Harold and Barbara Vickerses. While represented by another lawyer, the Vickerses were involved in a lawsuit with tenants who leased property from them. After the district court determined that the Vickerses owed money to the tenants, they terminated the services of their attorney and hired Rasmussen to evaluate the possibility of an appeal. The Vickerses also wanted Rasmussen to investigate bringing an action against the tenants for damage they had allegedly caused to the property.

When the Vickerses hired Rasmussen, the parties entered into a written fee agreement. Under the agreement, Rasmussen was to bill the Vickerses at the rate of $100 per hour and the Vickerses agreed to pay a $1,500 retainer, against which Rasmussen would initially

bill. The agreement also provided that Rasmussen would send monthly itemized statements to the Vickerses.

After receiving the retainer, Rasmussen moved for a new trial. The motion was denied, and the Vickerses decided not to file an appeal. Rasmussen also did some preparatory work to determine whether to file a new lawsuit against the tenants.

The last work Rasmussen did for the Vickerses occurred in March 1998. He sent a letter to the Vickerses requesting that they provide him with more information so that he could commence a new lawsuit against the tenants. After the Vickerses sent the requested information, they had little or no communication with Rasmussen over the next 1½ years.

As noted previously, under the terms of the fee agreement, Rasmussen was required to send monthly itemized statements to the Vickerses. In early 1998, at the request of the Vickerses, Rasmussen sent them a statement. It indicated that he had done $1,200 worth of legal work and that $300 remained of the retainer they had paid. The statement, however, was not itemized. This was the only statement that the Vickerses received from Rasmussen during his representation.

The Vickerses sent a letter to the Counsel for Discipline on February 11, 2000. The letter stated that Rasmussen "still owes us the remaining three hundred dollars [of the retainer] with some interest for using it all this time, plus an itemized statement so that we can see where all our money went." The Counsel for Discipline forwarded the letter to Rasmussen and requested a written response. Rasmussen failed to respond, and the Counsel for Discipline sent him another letter.

On March 27, 2000, Rasmussen mailed a letter to the Counsel for Discipline responding to the Vickerses' allegations. At the end of the letter, Rasmussen wrote, "I understand from their letter that Mr. and Mrs. Vickerses would like the remainder of their retainer back. That is their right. Perhaps you can give all of us some guidance that will bring this whole case to a conclusion." Rasmussen failed to include an itemized statement with the letter, and he did not refund the remainder of the retainer.

In April 2000, the Vickerses sent a letter to the Counsel for Discipline replying to Rasmussen's letter. Once again, they requested that Rasmussen provide an itemized statement and that

he refund the remainder of the retainer. On May 1, the Counsel for Discipline forwarded a copy of the letter to Rasmussen and directed him to provide an itemized statement and refund the remainder of the retainer.

Rasmussen provided an itemized statement on June 1, 2000. Around the same time, he also refunded the $300 that remained from the retainer.

Concerning count I, the relator charged and the referee found that Rasmussen had violated the following provisions of Canons 1 and 9 of the Code of Professional Responsibility:

DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(5) Engage in conduct that is prejudicial to the administration of justice. . . .

. . . .

DR 9-102 Preserving Identity of Funds and Property of a Client.

. . . . .

(B) A lawyer shall:

. . . .

(4) Promptly pay or deliver to the client as requested by the client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

## 2. COUNT II

Roger Gallagher hired Rasmussen in July 2000 to assist him in seeking relief from a 1998 conviction for felony sexual assault. Gallagher, who is physically disabled, also asked Rasmussen to investigate filing a 42 U.S.C. § 1983 (2000) action because the Department of Correctional Services had failed to address his needs. The charges against Rasmussen in count II addressed both his neglect in addressing Gallagher's case and his mishandling of a $3,000 retainer that Gallagher paid to him.

### (a) Neglect

Under their fee agreement, Gallagher was required to pay Rasmussen a retainer of $3,000. After Gallagher had paid the retainer, Rasmussen visited him on two occasions, once in July

2000 and once in September, to discuss the case. In October, Rasmussen filed a motion for postconviction relief. On October 6, the court denied the motion, reasoning that Gallagher had previously been denied postconviction relief and was therefore barred from bringing another motion for postconviction relief.

On October 11, 2000, following the denial of his motion for postconviction relief, Rasmussen sent Gallagher a letter notifying him of the decision. The letter stated that Rasmussen would investigate an appeal and "be in touch within 7 days." After receiving the letter, Gallagher sent a letter to Rasmussen inquiring what legal action they should take next. Gallagher also made several telephone calls to Rasmussen. We note that because of security restrictions, Gallagher was generally unable to leave messages with Rasmussen's voice mail.

Despite his promise in the October 11, 2000, letter and Gallagher's repeated attempts to communicate with him, Rasmussen did not contact Gallagher again until he sent a letter in January 2001. In the letter, Rasmussen wrote:

> As for your Habeas Corpus, I have not forgotten you. However, I do not believe that you have a strong case to be released upon your original conviction. I believe that your stronger case to be [sic] your current treatment and the inability to care for you and the systems previous ways that it has dealt with disabled prisoners.

Rasmussen did not explain how he had reached these legal conclusions.

After receiving the January 2001 letter, Gallagher sent a letter to Rasmussen inquiring why Rasmussen did not believe that a habeas corpus action would be successful and imploring him to "Get the Lead out."

According to Rasmussen, he sent a petition for habeas corpus and a letter instructing Gallagher to sign the petition in February 2001. Gallagher denied receiving the letter or the petition and claimed that despite repeated telephone calls and letters, he had no contact with Rasmussen after January 2001.

Gallagher's attempts to communicate with Rasmussen continued even after Gallagher had filed his complaint with the Counsel for Discipline in April 2001. We note that in his communications with the Counsel for Discipline, Rasmussen indicated that he

wished to continue as Gallagher's counsel. Moreover, as late as July 2001, Gallagher expressed a willingness to allow Rasmussen to continue as his counsel. Gallagher even prepared an application for commutation and filings for a federal habeas corpus action and a 42 U.S.C. § 1983 action and sent them to Rasmussen for his review. But at no time after February 2001 did Rasmussen contact Gallagher directly or do any legal work for him. Eventually, Gallagher was forced to file the habeas corpus action on his own.

Gallagher officially terminated Rasmussen's representation of him in a letter dated December 5, 2001. In the letter, Gallagher demanded that Rasmussen return personal records that Gallagher had provided to Rasmussen. When Gallagher had sent these records to Rasmussen, he had asked that Rasmussen make copies and return the originals. Rasmussen, however, kept the records.

Rasmussen failed to respond to the December 5, 2001, letter, and Gallagher sent another letter demanding the return of his records in February 2002. Only when the relator took Rasmussen's deposition at the end of February 2002, did Rasmussen return Gallagher's personal records. We note that Rasmussen's failure to return Gallagher's records impeded Gallagher's ability to seek relief in federal court.

### (b) Mishandling of Retainer

The second aspect of the charges relating to Rasmussen's representation of Gallagher address Rasmussen's mishandling of his trust account and the $3,000 retainer that Gallagher paid to him. Under the terms of their written fee agreement, Rasmussen was to bill Gallagher at the rate of $100 per hour and Gallagher agreed to pay a $3,000 retainer, against which Rasmussen would bill. Rasmussen admitted at the hearing that under the terms of the agreement, he was to deposit the retainer into his trust account and that only when he earned a portion of the fee could he withdraw it.

Rasmussen deposited Gallagher's $3,000 retainer into his trust account on July 14, 2000. The Counsel for Discipline contends that Rasmussen immediately withdrew the entire retainer from the account, well before he had earned any fees.

At the same time that he deposited Gallagher's check into his trust account, Rasmussen wrote a $3,000 check to himself.

Rasmussen initially contended that the $3,000 withdrawn on July 14, 2000, was not Gallagher's retainer. Instead, he argued that it was for fees that he had earned for working on an estate and that he did not withdraw the $3,000 that he claims to have earned for work done on Gallagher's case until March 2002.

At the hearing before the referee, however, Rasmussen admitted that he had received a $4,500 fee for his handling of the estate and the Counsel for Discipline presented evidence showing that Rasmussen had withdrawn this fee from his trust account in two separate transactions, one on May 15, 2000, and the other on May 22. After being confronted with this evidence, Rasmussen conceded that the July 14 withdrawal of $3,000 was not for the estate work. Instead, he claimed to not remember why he had withdrawn this money.

The confusion over why the $3,000 had been withdrawn on July 14, 2000, was compounded by Rasmussen's mismanagement of his trust account. The referee aptly described it as "appalling." In writing checks from the trust account, Rasmussen only sporadically noted in the memorandum portion of the check which client the check was for. Moreover, he did not maintain a trust account ledger and he did not always balance his trust account when he received bank statements. Rasmussen appears to have lost a number of returned checks and bank statements. He was also unable to describe why a number of deposits and withdrawals had been made in the account.

Moreover, Rasmussen also engaged in questionable billing practices concerning the Gallagher account.

Despite the fact that the written fee agreement between Rasmussen and Gallagher provided that Rasmussen would "send Client bills each month" Rasmussen concedes that he did not send monthly bills to Gallagher. Further, although Rasmussen claims to have sent an itemized bill in March 2002 to Gallagher, Gallagher testified that he never received the bill and that he saw it only when the Counsel for Discipline showed it to him at his deposition.

When Gallagher terminated Rasmussen as his counsel in December 2001, he requested that Rasmussen return the $3,000 retainer. Rasmussen failed to do so. In February 2002, Gallagher again requested that Rasmussen return the retainer. Rasmussen,

however, refused to do so. He claims that he worked 31 hours on Gallagher's case and that as a result, he is entitled to the retainer. Gallagher has filed a civil suit and, at the time of the hearing, was still attempting to recover the $3,000.

### (c) Referee's Findings on Count II

Concerning count II, the relator charged and the referee found that Rasmussen had violated the following provisions of Canons 1, 6, and 9 of the Code of Professional Responsibility:

DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(5) Engage in conduct that is prejudicial to the administration of justice. . . .

. . . .

DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

. . . .

(3) Neglect a legal matter entrusted to him or her.

DR 9-102 Preserving Identity of Funds and Property of a Client.

(A) All funds of clients paid to a lawyer or law firm shall be deposited in an identifiable account or accounts maintained in the state in which the law office is situated in one or more state or federally chartered banks, savings banks, savings and loan associations, or building and loan associations insured by the Federal Deposit Insurance Corporation, and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

(1) Funds reasonably sufficient to pay account charges may be deposited therein.

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

. . . .

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to the client regarding them.

(4) Promptly pay or deliver to the client, as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

The referee also made a specific finding that at the formal hearing, Rasmussen "was not truthful in regard to whether he deposited the $3,000.00 Gallagher fee into his trust account and then immediately withdrew it."

### 3. COUNT III

Amy Rezac hired Rasmussen in July 1998 after receiving a letter from the Internal Revenue Service (IRS) notifying her that she owed additional taxes for the 1995 tax year. The IRS claimed that Rezac had failed to report tips earned while she was working as a waitress in New York City.

After Rasmussen began representing Rezac, she received a second letter from the IRS stating that she owed about half the amount stated in the original letter. She assumed this reduction was because of work Rasmussen had done, although she had not received any information from Rasmussen about what work he had completed on her case. Rasmussen also apparently believed that the second letter reflected a reassessment of how much Rezac owed, and he told her that paying the amount listed in the second letter would cost less than disputing the matter. Rezac agreed, and Rasmussen instructed her to put a restrictive endorsement on the check. He believed that the restrictive endorsement would act as an accord and satisfaction, thereby resolving the matter completely when the IRS endorsed it.

In July 1999, Rezac received another letter from the IRS informing her that she owed an additional $3,949.01 and that her restrictive endorsement had not acted as an accord and satisfaction. Later discussions with the IRS revealed that the amount listed in the second letter represented only a partial assessment equal to the Social Security tax that the IRS claimed Rezac owed.

A more complete assessment showed that Rezac owed $3,949.01 in federal income tax as well.

Upon learning that the IRS still claimed that she owed income tax, Rezac attempted to contact Rasmussen. According to Rezac, she telephoned him at least 10 times between July and September 1999, but was only able to get his voice mail. She also sent him faxes and letters. He did not respond to her inquiries until some time in September or October.

Rasmussen mailed a letter to the IRS in October 1999 complaining about the IRS' claims that Rezac owed additional income tax and requesting further clarification. He did not, however, send a copy of the letter to Rezac. Because she did not know that Rasmussen had sent the letter to the IRS, she made several attempts to contact Rasmussen during late 1999 and early 2000. Rasmussen failed to respond to these inquiries until late January 2000.

Rezac received a letter from the New York Department of Revenue in February 2000 notifying her that she had underreported her 1995 income tax and that she owed the State of New York income tax. She forwarded the material to Rasmussen.

During March 2000, Rezac once again made several telephone calls to Rasmussen's office seeking to make an appointment with him. Rasmussen failed to respond to most of these calls. When he did respond, he set up an appointment to meet with Rezac, but he then canceled the meeting and it had to be rescheduled.

Rasmussen sent a letter to the New York Tax Compliance Division in May 2000 notifying it that Rezac disputed any liability. He did not, however, forward a copy to Rezac.

In a July 5, 2000, letter, Rezac instructed Rasmussen to send another letter to the New York Department of Revenue and requested that he provide her with a copy of everything that he had sent to the IRS and the State of New York. Although Rasmussen sent the letter to the New York Department of Revenue, he did not send Rezac a copy of the letter. Moreover, he failed to provide Rezac with the other information she had requested in the July 5 letter.

After terminating Rasmussen's representation of her in August 2000, Rezac hired another attorney. She is still attempting to resolve her tax issues with the IRS and the State of New York.

Concerning count III, the relator charged and the referee found that Rasmussen had violated DR-102(A)(1) and (5) and DR 6-101(A)(3).

### 4. COUNT IV

Count IV addresses Rasmussen's failure to cooperate with the Counsel for Discipline during its investigation. The record contains several examples of Rasmussen's noncooperation with the Counsel for Discipline. Rasmussen failed to respond timely or appropriately to the Counsel for Discipline's inquiries about each of the counts outlined above. Rasmussen also failed to appear at a deposition scheduled for January 15, 2001, and the deposition had to be rescheduled. Further, the Counsel for Discipline was forced to serve multiple subpoenas to obtain documents necessary to investigate its case. Finally, Rasmussen failed to obey the referee's September 13, 2002, order which required him "to fully comply with all of the Relator's discovery requests on or before Tuesday, September 17th at 1:00 P.M."

Concerning count IV, the relator charged and the referee found that Rasmussen had violated DR-102(A)(1) and (5).

### 5. REFEREE'S RECOMMENDED SANCTION

The relator originally recommended a 1-year suspension for Rasmussen's sanction. The referee rejected that as being too lenient. After stating that he was "sorely tempted to recommend disbarment," the referee recommended a suspension of not less than 2 years, reasoning that "[p]erhaps during a substantial suspension [Rasmussen] can reflect upon his behavior and reform it."

## II. ASSIGNMENT OF ERROR

Rasmussen claims that the relator has not shown by clear and convincing evidence that he violated the Code of Professional Responsibility.

## III. STANDARD OF REVIEW

■A proceeding to discipline an attorney is a trial de novo on the record, in which this court reaches a conclusion independent of the findings of the referee; provided, however, that when the credible evidence is in conflict on a material issue of fact, the court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of

the facts rather than another. *State ex rel. Counsel for Dis. v. Huston*, 262 Neb. 481, 631 N.W.2d 913 (2001).

## IV. ANALYSIS

■ Rasmussen complains that the relator has failed to meet its burden of proof. To sustain a charge in a disciplinary proceeding against an attorney, a charge must be established by clear and convincing evidence. *State ex rel. Counsel for Dis. v. Huston, supra.*

As to count I, the evidence presented at the hearing shows that on February 11, 2000, the Vickerses sent a letter to the Counsel for Discipline in which they requested that Rasmussen return the $300 that remained of the retainer they had paid him. The Counsel for Discipline forwarded the letter to Rasmussen. Yet, Rasmussen—despite additional letters from both the Counsel for Discipline and the Vickerses demanding the return of the $300—inexplicably waited until June to return the money. This evidence established clearly and convincingly that Rasmussen violated DR 1-102(A)(1) and (5) and DR 9-102(B)(4).

The evidence presented by the relator in support of count II showed that Rasmussen neglected Gallagher's case, paid to himself Gallagher's entire retainer before he had earned any of it, and failed to maintain records showing how he had used Gallagher's retainer. This evidence established clearly and convincingly that Rasmussen violated DR 1-102(A)(1) and (5), DR 6-101(A)(3), and DR 9-102(A)(1) and (2) and (B)(3).

Concerning count III, the evidence established that Rasmussen did only perfunctory legal work for Rezac while consistently ignoring her attempts to contact him. Moreover, when Rasmussen provided her with legal advice, it was highly questionable. We find that the relator proved by clear and convincing evidence that in representing Rezac, Rasmussen violated DR 1-102(A)(1) and (5) and DR 6-101(A)(3).

Count IV addresses Rasmussen's behavior during the relator's investigation and the disciplinary proceedings. The record is, as noted by the referee, replete with instances of Rasmussen's noncooperation. Accordingly, we find that the there is clear and convincing evidence establishing that Rasmussen violated DR 1-102(A)(1) and (5).

We note that although the formal charges accused Rasmussen of violating his oath of office, see Neb. Rev. Stat. § 7-104 (Reissue 1997), the referee's report is silent on the issue. We find that the evidence clearly and convincingly shows that Rasmussen violated his oath of office.

We now turn to the question of the appropriate sanction for Rasmussen. To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, we consider the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the respondent generally, and (6) the respondent's present or future fitness to continue in the practice of law. *State ex rel. Counsel for Dis. v. Thompson*, 264 Neb. 831, 652 N.W.2d 593 (2002). Each case must be evaluated individually in light of its particular facts and circumstances. *Id.* For the purposes of determining the proper discipline of an attorney, this court considers the attorney's acts both underlying the events of the case and throughout the proceeding. *Id.*

Some of the ethical violations that Rasmussen committed are of the type for which we have typically reserved the most severe sanctions. We are particularly distressed by the callousness with which he treated Gallagher. Rasmussen did very little legal work for Gallagher, and that which he did do, he did poorly. He failed to return Gallagher's personal records, despite Gallagher's requests. He ignored Gallagher's repeated attempts to communicate with him, something we find particularly troublesome given that Rasmussen seems to have had little trouble staying in contact with Gallagher before he received Gallagher's retainer. Finally, and more important, Rasmussen paid himself Gallagher's retainer before he had earned it, conduct which we have treated as being the equivalent of misappropriating funds. See, e.g., *State ex rel. Counsel for Dis. v. Huston*, 262 Neb. 481, 631 N.W.2d 913 (2001). The misappropriation of a client's funds is more than a grievous breach of professional ethics. It violates basic notions of honesty and endangers public confidence in the legal profession. *State ex rel. NSBA v. Gridley*, 249 Neb. 804, 545 N.W.2d 737 (1996). Absent mitigating circumstances, the appropriate discipline in cases of misappropriation

or commingling of client funds is disbarment. *State ex rel. Counsel for Dis. v. Huston, supra*; *State ex rel. NSBA v. Howze*, 260 Neb. 547, 618 N.W.2d 663 (2000).

Moreover, Rasmussen has treated these proceedings with the same type of callousness and dishonesty with which he has treated his clients. Since complaints were lodged against him, Rasmussen has (1) failed to timely or appropriately respond to the relator's inquiries; (2) missed his first deposition; (3) failed to comply with the referee's discovery orders; (4) lied while under oath at the formal hearing; (4) failed to file a posthearing brief with the referee, despite indicating that he would do so; and (5) without notice or explanation, failed to appear at oral arguments before this court.

Although Rasmussen presented no mitigating circumstances, the referee recommended a sanction of not less than a 2-year suspension. He reasoned that "[p]erhaps during a substantial suspension [Rasmussen] can reflect upon his behavior and reform it." We do not share the referee's confidence in the ability of Rasmussen to reform his behavior. Rasmussen has failed to demonstrate any sincere regret for his behavior, and he continues to show disrespect for his clients and the legal system. Given the gravity of Rasmussen's offenses, the need to deter others from committing similar offenses, Rasmussen's poor attitude, our belief that he is either unwilling or unable to reform his behavior, the need to protect the public from his future misconduct, and the lack of any mitigating circumstances, we conclude that disbarment is the appropriate remedy.

## V. CONCLUSION

It is the judgment of this court that Rasmussen be disbarred from the practice of law in the State of Nebraska, and we therefore order him disbarred, effective immediately. Rasmussen shall comply with Neb. Ct. R. of Discipline 16 (rev. 2001), and upon failure to do so, he shall be subject to punishment for contempt of this court. Rasmussen shall pay costs and expenses in accordance with Neb. Rev. Stat. §§ 7-114 and 7-115 (Reissue 1997) and Neb. Ct. R. of Discipline 23(B) (rev. 2001).

JUDGMENT OF DISBARMENT.