671 N.W.2d 765 (2003)
267 Neb. 57
STATE of Nebraska ex rel. COUNSEL FOR DISCIPLINE OF the NEBRASKA SUPREME COURT, Relator,
v.
Stuart B. MILLS, Respondent.
No. S-02-1085.
Supreme Court of Nebraska.
December 5, 2003.
*768 Kent L. Frobish, Assistant Counsel for Discipline, for relator.
Robert F. Bartle, of Bartle & Geier Law Firm, Lincoln, for respondent.
HENDRY, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
PER CURIAM.

INTRODUCTION
The office of the Counsel for Discipline of the Nebraska Supreme Court filed amended formal charges against respondent, Stuart B. Mills. After a formal hearing, the referee concluded that Mills had violated the Code of Professional Responsibility and recommended that Mills be suspended from the practice of law for a period of 5 months. Both the Counsel for Discipline and Mills filed exceptions to the referee's recommended sanction.

FACTUAL BACKGROUND
Mills was admitted to the practice of law in the State of Nebraska on January 22, 1973. The charges in this case arise from Mills' representation of Cheryl Borgelt, personal representative of the estate of David Borgelt. David died intestate in Cuming County, Nebraska, on July 28, 1998, and was survived by his wife, Cheryl, five adult children, and several grandchildren. Following David's death, Cheryl retained Mills to assist her in the estate proceedings. Mills testified that the Borgelt estate was the largest he had ever handled.
Due to David's intestacy, as well as the size of the estate, consideration was given as to the best method to minimize or defer estate taxes. The method chosen was renunciation, wherein the Borgelts' adult children would renounce any claim they had to the Borgelt estate so that the property could pass directly to Cheryl. It was further determined that when necessary, the Borgelts' adult children would renounce on behalf of their minor children. Mills testified that he had never handled an estate in which a renunciation or disclaimer was used. Although Mills states that he "did not necessarily agree that the renunciation process would necessarily be in the best interest of the client," brief for respondent at 3, Mills ultimately advised Cheryl to proceed with renunciation.
Prior to retaining Mills, the record discloses that Cheryl met with another attorney regarding the feasibility of a renunciation plan. That attorney informed Cheryl that the Borgelts' children could not unilaterally renounce on behalf of their minor children. The record further shows that Mills was aware of that attorney's opinion at the time he undertook his representation of Cheryl and the estate.
Before recommending that the adult children renounce not only their interests in the estate but also that of their minor children, Mills contacted an attorney employed in the estate tax division of the Internal Revenue Service (IRS) with whom Mills had "developed a working relationship, long-standing in nature." Brief for respondent at 3. Mills' purpose in contacting the attorney was to ascertain *769 whether renunciation would be permissible in the circumstances of the Borgelt estate. The attorney told Mills that he believed renunciation would be permissible. This discussion was not confirmed in writing, and Mills did no further research on the issue. Mills acknowledged in his testimony before the referee that he should not have relied on the attorney's belief. It was later determined that under the circumstances presented, the Borgelts' adult children could not renounce their respective minor children's interest without court approval.
The renunciations prepared by Mills required that the signatures of those executing the renunciations be notarized. Since several of the Borgelt children lived outside the Cuming County area, their renunciations were sent by mail. Mills requested those children living outside the area to sign and return the renunciations to him, at which time he would notarize the signatures. Upon receipt, Mills notarized the renunciations despite the fact that he had not witnessed the children's signing the documents.
In addition to notarizing the documents in this manner, Mills directed his secretary to alter the dates on which the Borgelt children had actually signed the renunciations so that they were uniformly dated March 25, 1999, which the secretary accomplished by using "white out." Mills also notarized several warranty deeds signed by the Borgelt children, again without witnessing their signatures. To those deeds, Mills affixed a date of April 8, 1999, although that was not the date on which the deeds were signed.
Mills believed all of these steps were required to be completed within 9 months of David's death. The record indicates, however, that both the renunciations and the deeds were actually circulating amongst the Borgelt family in May 1999, which was beyond the 9-month postdeath time limitation of April 28, 1999.
At the hearing before the referee, Mills testified that he mistakenly believed it was sufficient that the renunciations simply be signed within 9 months of David's death, and that filing within that time period was not required. See, generally, Neb.Rev. Stat. § 30-2352(b) (Reissue 1995). Federal estate tax return form 706 (Form 706) was completed and filed on March 25, 1999. The renunciations were filed with the county court for Cuming County on June 30, 1999, and the deeds were filed with the register of deeds of Cuming County on that same date.
In reviewing copies of the renunciations, Michele Moser, the IRS attorney assigned to examine the tax return, "noted that the renunciations were not timely filed." In addition, Moser believed there were indications suggesting the renunciations were not properly dated. Moser then traveled to Cuming County to examine the original renunciations. Upon examination, Moser observed that most of the renunciations contained two dates, a typewritten date over the "white out" and a handwritten date under the "white out."
When Moser contacted Mills concerning these discrepancies, Mills was not truthful about the date the renunciations were signed or in whose presence the renunciations were acknowledged. Mills also told Moser he did not know why "white out" had been used on the renunciations, claiming it must have been done by his secretary for appearance purposes. Mills further told Moser that the renunciations were received by the personal representative prior to March 25, 1999, the date Form 706 was filed.
After Mills had been contacted by Moser, Mills wrote a letter to Cheryl dated June 2, 2000, which stated in part, "I left a *770 message on your answering machine this morning. It is critical that in the event [Moser] calls any of your children that they tell her they were in Wisner on March 25, 1999 and signed the renunciation (disclaimer) in my presence."
Eventually, Mills admitted his wrongdoing and a new attorney was retained by Cheryl to represent the Borgelt estate. The record indicates that during the IRS investigation of the circumstances surrounding the filing of Form 706, neither Cheryl nor her children provided any false or inaccurate information to the IRS and, further, that no family member was the focus of any criminal investigation. The record further indicates that Cheryl and the estate suffered a financial loss due to Mills' actions. Also, at the time of Mills' hearing, the potential existed for additional IRS penalties resulting from these events.
Amended formal charges were filed against Mills in this court, alleging he violated the following provisions of the Code of Professional Responsibility:
DR 1-102 Misconduct.
(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
....
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice....
(6) Engage in any other conduct that adversely reflects on his or her fitness to practice law.
....
DR 6-101 Failing to Act Competently.
(A) A lawyer shall not:
(1) Handle a legal matter which the lawyer knows or should know that he or she is not competent to handle, without associating with a lawyer who is competent to handle it.
(2) Handle a legal matter without preparation adequate in the circumstances.
(3) Neglect a legal matter entrusted to him or her.
....
DR 7-102 Representing a Client Within the Bounds of the Law.
(A) In his or her representation of a client, a lawyer shall not:
....
(4) Knowingly use perjured testimony or false evidence.
(5) Knowingly make a false statement of law or fact.
(6) Participate in the creation or preservation of evidence when the lawyer knows or it is obvious that the evidence is false.
(7) Counsel or assist a client in conduct that the lawyer knows to be illegal or fraudulent.
(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.
It was further alleged that Mills' conduct violated Neb.Rev.Stat. § 76-218 (Reissue 1996) (violation of notary's duty).

REFEREE'S FINDINGS
A referee was appointed to conduct a hearing in this matter. In a report filed February 21, 2003, the referee found there was clear and convincing evidence that Mills had violated Canon 1, DR 1-102(A)(1) and (3) through (6); Canon 6, DR 6-101(A)(1) and (2); and Canon 7, DR 7-102(A)(4) through (8); as well as § 76-218. The referee found there was not clear and convincing evidence as to any violation of DR 6-101(A)(3). The referee *771 recommended a suspension of 5 months, noting that
[t]he nature of the offense is extremely serious; the need for deterring others is evident; the maintenance of the Bar's reputation and protection of the public militates in favor of some substantial punishment; the attitude of the Respondent was cooperative and remorseful and is taken into account; and, finally, the behavior of the Respondent does bring into question his fitness to continue to practice law.

ASSIGNMENTS OF ERROR
The Counsel for Discipline filed an exception to the referee's recommended sanction as being too lenient. Mills filed cross-exceptions to (1) the referee's finding that "the behavior of the Respondent does bring into question his fitness to continue to practice law" and (2) the referee's recommended sanction, arguing that the record supported a sanction of a suspension of no greater than 60 days.

STANDARD OF REVIEW
A proceeding to discipline an attorney is a trial de novo on the record, in which the Nebraska Supreme Court reaches a conclusion independent of the findings of the referee; provided, however, that where the credible evidence is in conflict on a material issue of fact, the court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. State ex rel. Counsel for Dis. v. Achola, 266 Neb. 808, 669 N.W.2d 649 (2003). Disciplinary charges against an attorney must be established by clear and convincing evidence. Id.

ANALYSIS
We read Mills' exception to the referee's finding that "the behavior of Respondent does bring into question his fitness to continue to practice law" as relating only to the referee's recommended sanction. When no exceptions to the referee's findings of fact are filed by either party in a disciplinary proceeding, the court may, at its discretion, adopt the findings of the referee as final and conclusive. Achola, supra. Because neither party has filed exceptions to the referee's findings of fact, we consider them final and conclusive pursuant to Neb. Ct. R. of Discipline 10(L) (rev. 2001). We therefore adopt the referee's findings of fact and conclude that clear and convincing evidence establishes that Mills violated DR 1-102(A)(1) and (3) through (6); DR 6-101(A)(1) and (2); DR 7-102(A)(4) through (8); and § 76-218. Thus, we determine that the only issue remaining for this court's consideration is the appropriate sanction.
To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, the Nebraska Supreme Court considers the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance and reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the respondent generally, and (6) the respondent's present or future fitness to continue in the practice of law. Achola, supra. Each attorney discipline case must be evaluated individually in light of its particular facts and circumstances. Id. For purposes of determining the proper discipline of an attorney, this court considers the attorney's acts both underlying the events and throughout the proceeding. Id.
Mills' conduct as counsel for the personal representative of this estate is troubling. Such conduct consisted of (1) handling a legal matter which he knew or should have known he was not competent to handle *772 without associating with an attorney who was competent; (2) handling a legal matter without adequate preparation; (3) notarizing certain renunciations and deeds without witnessing the signatures of those signing the respective documents; (4) directing his secretary to alter the dates the renunciations were actually signed and to affix a uniform date of March 25, 1999; (5) affixing a uniform date of April 8, 1999, to some of the deeds, which did not conform to the actual dates on which the deeds were signed; (6) causing to be filed in both the county court for Cuming County and the register of deeds for Cuming County documents known to be false; (7) falsely informing the IRS, through Moser, that (a) the renunciations were signed in Mills' presence on March 25, 1999, (b) he did not recall why "white out" was used other than perhaps by his secretary for appearance purposes, and (c) the renunciations were received by the personal representative prior to March 25, 1999; and (8) filing Form 706 based on information Mills knew to be false.
As troubling as this conduct is, the most egregious aspect is what followed. In a letter to Cheryl dated June 2, 2000, Mills elicits the aid of Cheryl and her children in perpetuating his deception, telling Cheryl, "[i]t is critical that in the event [Moser] calls any of your children that they tell her they were in Wisner on March 25, 1999 and signed the renunciation (disclaimer) in my presence."
Pursuant to Neb. Ct. R. of Discipline 4 (rev. 2001), this court may consider any of the following as sanctions for attorney misconduct: (1) disbarment; (2) suspension for a fixed period of time; (3) probation in lieu of suspension, on such terms as the court may designate; (4) censure and reprimand; or (5) temporary suspension. State ex rel. Counsel for Dis. v. Achola, 266 Neb. 808, 669 N.W.2d 649 (2003). We therefore turn our attention to the determination of an appropriate sanction, recognizing that the propriety of a sanction must be considered with reference to the sanctions this court has imposed in prior cases presenting similar facts. See State ex rel. NSBA v. Gallner, 263 Neb. 135, 638 N.W.2d 819 (2002).
The only Nebraska case cited by the Counsel for Discipline involving the misrepresentation of an acknowledgment is State ex rel. Nebraska State Bar Assn. v. Butterfield, 169 Neb. 119, 98 N.W.2d 714 (1959). In that case, Elven Butterfield represented his clients in a real estate transaction. The referee found that during a subsequent proceeding to set aside a deed involved in that transaction, Butterfield falsely testified that one of the signatures on the deed was not acknowledged before him. The referee further found that although the acknowledgment had occurred on or before June 7, 1956, Butterfield postdated the acknowledgement to January 2, 1957. The referee concluded that Butterfield had improperly postdated the deed and the acknowledgement and had given false testimony to a court of law. We suspended Butterfield for 6 months.
In State ex rel. NSBA v. Scott, 252 Neb. 698, 564 N.W.2d 588 (1997), this court was faced with an attorney who had lied to both the Department of Veterans Affairs and the Workers' Compensation Court during the course of representing his client. We stated that "[a]lthough we encourage all attorneys to zealously represent their clients, such advice cannot be construed to permit attorneys to deceive a court of law or other interested entities," id. at 704, 564 N.W.2d at 592, and suspended the attorney for 1 year.
The present case, however, involves conduct beyond falsifying renunciations and deeds and providing false information to a county court, the register of deeds, and the *773 IRS. It includes an element not found in Butterfield or Scott; that element is Mills' attempt to elicit the aid of Cheryl, his client, and her children in his deception. Our review of Nebraska cases has found no similar factual circumstance, and the parties cite us to none. We therefore look to other jurisdictions presenting similar facts for additional guidance. See State ex rel. NSBA v. Frederiksen, 262 Neb. 562, 635 N.W.2d 427 (2001) (looking to other jurisdictions for guidance in determining appropriate disciplinary sanction).
In re Corizzi, 803 A.2d 438 (D.C.2002), involved an attorney who represented two clients in separate personal injury cases. Both clients had been treated by a chiropractor suggested by Anthony Corizzi. Corizzi counseled his clients to commit perjury during their depositions with respect to how each had been referred to the chiropractor, as Corizzi was attempting to conceal the fact that he and the chiropractor had a referral relationship. In furtherance of Corizzi's suggestion, both clients lied in their depositions "to the virtual destruction of their causes." Id. at 439. In addition, Corizzi failed to advise one of his clients of a settlement offer, and made false statements to the "Bar Counsel" denying he had counseled his clients to lie. The Court of Appeals for the District of Columbia concluded that Corizzi's actions violated ethical rules equivalent to DR 1-102(A)(4) and DR 7-102(A)(7). Being "particularly influenced by the violations... which establish that [Corizzi] instructed two of his clients to lie in their depositions," 803 A.2d at 442, the court, noting the lack of mitigating factors, disbarred Corizzi, stating:
While engaged in the practice of law, he blatantly solicited outright perjury by two of his clients on separate occasions to conceal his reciprocal relationship with the chiropractor. The predictable consequences of his action were the virtual destruction of his clients' cases and their exposure to possible criminal prosecution, clients to whom he owed the highest duty of fidelity.
Id. at 442-43.
Matter of Friedman, 196 A.D.2d 280, 609 N.Y.S.2d 578 (1994), involved an attorney who engaged in multiple acts of serious misconduct. Relevant to our inquiry was an incident whereby Theodore Friedman had a private investigator approach a witness in a negligence suit he was litigating. The witness later informed the opposing attorney that Friedman's private investigator had tried to bribe him. Apparently unaware that the opposing side knew of the bribe, Friedman and the private investigator met with the witness and asked the witness to testify falsely about various matters, including whether the witness had been offered or paid any money, and whether the witness had ever met Friedman. The court, concluding that Friedman's actions with respect to this incident were in violation of DR 7-102(A)(4), (6), and (8), disbarred Friedman, noting that "[a]ny one of [his] many serious violations would be ground for removal of the respondent from the roll of attorneys." Matter of Friedman, 196 A.D.2d at 295, 609 N.Y.S.2d at 586.
Matter of Geron, 486 N.E.2d 514 (Ind. 1985), presented a factual situation in which respondent Terry Geron was representing a client on a contempt citation. Geron told his client to wait in the stairwell while he went into the courtroom to check the nature of the hearing. Five minutes later, Geron returned to his client and told him to leave the courthouse and go to "`The Village Pub.'" Id. at 515. The client did so, and Geron reentered the courtroom, informing the court that his client had yet to arrive. Geron then made a few telephone calls and informed the *774 court that his client was on the way. However, the client never arrived and the hearing proceeded in the client's absence. During the hearing, witnesses testified that they had seen Geron and his client arrive at the courthouse together. In response, Geron falsely testified that he had not entered the courthouse with his client. Geron later informed his client of the nature of Geron's testimony, and threatened the client with bodily harm should the client fail to testify as Geron advised. The Indiana Supreme Court found that Geron had violated DR 1-102(A)(1) and (3) through (6) and DR 7-102(A)(3) through (7). The court, in suspending Geron for 2 years, stated:
The bizarre behavior surrounding this incident calls into question Respondent's professional competence and ethics. He jeopardized his client's interest and the integrity of the court in order to camouflage his errors. The extent of his willingness to do so demonstrates a serious lack of understanding of the professional obligations of a lawyer. It is difficult, if not impossible, to discern the motivating factors behind conduct of this nature, but it is certain that this Court cannot allow its reoccurrence.
Matter of Geron, 486 N.E.2d at 516.
Finally, in In the Matter of Gross, 435 Mass. 445, 759 N.E.2d 288 (2001), respondent Frank Gross was retained to represent a client charged with operating a motor vehicle while under the influence of alcohol and leaving the scene of an accident. Although at the time of her arrest the client acknowledged that she was the operator of the vehicle, Gross decided to employ both an alibi defense and a defense based upon mistaken identification. In furtherance of these defenses, and in response to the court's calling the case for trial, Gross had the alibi witness approach as if she were the defendant. This was all done in an attempt to confuse the victim, who was present, and hopefully prompt a misidentification at trial. Gross' attempt at confusing the victim was discovered.
Though initially denying his actions, Gross eventually acknowledged that the alibi witness, and not his client, had come forward when the case was called for trial. However, Gross insisted that the mixup was due to "`some confusion.'" Id. at 447, 759 N.E.2d at 290. Gross later contacted his client and the alibi witness, informing them that both would be questioned about the incident, and advising them to tell the judge that they, too, had been "`confused.'" Id. The Supreme Judicial Court of Massachusetts concluded that Gross had violated DR 1-102(A)(4) through (6); DR 6-101(A)(2) and (3); DR 7-101(A)(1) and (3); DR 7-102(A)(3), (5), and (7); DR 7-102(B)(1) and (2); and DR 7-104(A)(2). Noting a prior disciplinary violation involving deceit, the court suspended Gross for 18 months, stating:
A knowing misrepresentation to a court is itself a serious violation, and that serious violation was then compounded by other aggravating factors. The respondent's orchestration of the impersonation scheme before the court was a form of misrepresentation amounting to criminal contempt and obstruction of justice.... When the ruse was uncovered, the respondent sought to evade responsibility, and asked his client and another witness to make further misrepresentations to the court to assist him in covering up his own wrongdoing. Ensnaring them in the scheme led to the issuance of a default warrant against his client, a capias for the arrest of the witness, and potential criminal charges against the witness.
In the Matter of Gross, 435 Mass. at 452-53, 759 N.E.2d at 293-94.
*775 Before imposing a disciplinary sanction, we must also consider any mitigating factors present. State ex rel. NSBA v. Frederiksen, 262 Neb. 562, 635 N.W.2d 427 (2001). Mills argues that several mitigating factors exist. To begin with, Mills argues that Cheryl and her family were not the complainants in this case.
Although it is true that Mills' actions were brought to the attention of the Counsel for Discipline by the attorney retained to replace Mills, that attorney testified at Mills' hearing:
[Counsel for relator:] I just want to focus here for a moment. Why did you file the grievance as opposed to [Cheryl], the client of Stuart Mills, filing the grievance?
A. If I had not, I believe the client would have because of the anger or distress they felt. And in discussing it, they preferred that I file it. Also, because of the things that came to my attention in the course of working with the [IRS] to resolve things, I became concerned that it also was my obligation [under the Code] to file something.
Our de novo review of the record simply shows that Cheryl preferred that her new attorney file the complaint. Even though Cheryl and her family were not the "complainants," we conclude that under these circumstances, the identity of the party actually filing the complaint is not a mitigating factor.
Next, Mills argues that he has suffered financial consequences as a result of this action. Specifically, Mills argues that he has "incurred defense costs relating to the IRS investigation" and that he has lost present and future clients as a result of his actions. Brief for respondent at 11. Mills also argues that he "will suffer the shame of the proceeding represented here." Id. However, these are merely consequences of Mills' own inappropriate conduct and offer nothing in the way of explaining the underlying reason for such conduct. Under these circumstances, they are not mitigating factors.
Finally, Mills contends he was suffering from "the mitigating factors of [a] difficult personal situation at home, as well as [a] difficult office situation." Brief for respondent at 10. In support of this argument, Mills cites State ex rel. Counsel for Dis. v. Koenig, 264 Neb. 474, 647 N.W.2d 653 (2002), and State ex rel. Counsel for Dis. v. Thompson, 264 Neb. 831, 652 N.W.2d 593 (2002).
Mills first compares his situation to Koenig, stating that "[t]he stressful personal crisis and psychological issues confronting... Mills presents a case similar to the court's recognition of such circumstances in [Koenig]." Brief for respondent at 10. However, Koenig is inapplicable, as in that case, this court makes no mention of a "stressful personal crisis and psychological issues."
Thompson, however, does consider "psychological issues." In Thompson, this court gave mitigating weight to Thompson's diagnosed depression. In Mills' case, however, the referee specifically determined:
I am not prepared to give great weight to the personal problems (i.e., loss of a long-time secretary, deterioration in his marriage relationship) which ... Mills claimed clouded his judgment. It should be noted that during a critical period of time involved hereJanuary 1, 1999 to August 1, 1999... Mills did not see fit to seek out professional medical treatment.
The type of personal problem being endured by ... Mills in this case is not, *776 in my view, the kind of matter which this Court has felt worthy of mitigation.
(Citation omitted.)
Our de novo review of the record supports the referee's determination. Unlike Thompson, this record contains no diagnosis of depression. The diagnosis is that of "adjustment disorder of adult life with mixed emotional features." Mills' "treatment" for this specific diagnosis consisted principally of one office "interview" on December 10, 1999, and two telephone "visits" with a clinical psychologist on December 13 and 21. With regard to the December 21 visit, the psychologist's records state that "[Mills] thinks that he can handle the problems with the help of his friends, so he decided to call back if the problems again become overwhelming." There is no evidence of any further treatment or evaluation by this psychologist.
Although we acknowledge Mills' additional testimony that approximately 1 year after this initial treatment, he received "counseling of a similar nature" from another counselor, the medical evidence in this record does not approach that in Thompson, nor does it contain any evidence that Mills' diagnosis was a direct and substantial contributing factor to his misconduct or that treatment will substantially reduce the risk of further misconduct. See Thompson, supra. We determine that based upon this record, Mills' adjustment disorder is not a mitigating factor.
In an attorney discipline proceeding, an isolated incident not representing a pattern of conduct is considered as a factor in mitigation. State ex rel. Counsel for Dis. v. Apker, 263 Neb. 741, 642 N.W.2d 162 (2002). An attorney's cooperation during the process is yet another factor to be considered in mitigation. Id. Finally, the attorney's admission of responsibility for his or her actions reflects positively upon his attitude and character and is to be considered in determining the appropriate discipline. Id.
It is clear from the record that Mills' behavior surrounding his handling of the Borgelt estate was an isolated incident in what has otherwise been an exemplary legal career. The record indicates that Mills is involved in his community and has countless letters of support from judges, lawyers, and laypersons. In addition, Mills has never been disciplined in the 30 years he has been authorized to practice law in Nebraska.
Although Mills initially lied to the IRS during its investigation, he did eventually cooperate and has fully cooperated with the Counsel for Discipline's investigation into this matter. Furthermore, Mills has admitted his wrongdoing and has admitted that he engaged in conduct which violates the Code of Professional Responsibility.
Mills' actions, particularly with respect to eliciting the aid of Cheryl and her children in perpetuating his deception to the IRS, are egregious. Nevertheless, this case is unlike In re Corizzi, 803 A.2d 438 (D.C.2002), in which the attorney made false statements to "Bar Counsel" denying that he had advised his clients to lie and where the court specifically noted the lack of any mitigating factors, and Matter of Friedman, 196 A.D.2d 280, 295, 609 N.Y.S.2d 578, 586 (1994), which involved "many serious violations" and where the only mitigating evidence consisted of character witnesses. In this case, sufficient evidence in the form of Mills' cooperation, the absence of any prior discipline, and an otherwise exemplary 30 years of practice, exists to mitigate against the disbarment imposed in In re Corizzi and Matter of Friedman. Upon our de novo review of the record, this court determines that *777 Mills should be suspended from the practice of law for a period of 2 years.

CONCLUSION
The Counsel for Discipline's exception with respect to the referee's recommended sanction is upheld. Mills' exceptions with regard to the recommended sanction are overruled. Mills is hereby suspended from the practice of law for a period of 2 years, effective immediately. Mills is directed to comply with Neb. Ct. R. of Discipline 16 (rev. 2001), and upon failure to do so, he shall be subject to punishment for contempt of this court. Mills is directed to pay costs and expenses in accordance with Neb.Rev.Stat. §§ 7-114 and 7-115 (Reissue 1997) and Neb. Ct. R. of Discipline 23 (rev. 2001).
JUDGMENT OF SUSPENSION.
GERRARD, J., not participating.